1

THE HONORABLE JOHN C. COUGHENOUR

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

10
AMERICAN CAPITAL HOMES, INC., a
Washington Corporation; AMERICAN
11
PROPERTY DEVELOPMENT, INC., a
Washington Corporation; AMERICAN
12
PROPERTY DEVELOPMENT OF
NORTHERN CALIFORNIA, LLC, a
13
Washington Limited Liability Company;
ROGER KUULA, an individual; and GREG
14
BORREGO, an individual,

No.: 09-00622 JCC

**DEFENDANTS' ANSWER TO
PLAINTIFFS' FIRST AMENDED
COMPLAINT AND
GREENWICH'S COUNTERCLAIM
FOR BREACH OF CONTRACT**

15

Plaintiffs,

16

v.

17
GREENWICH INSURANCE COMPANY, a
foreign corporation, and THE XL AMERICA
18
INSURANCE GROUP, a foreign
corporation,

19

20

Defendants.

21

Defendants Greenwich Insurance Company ("Greenwich") and the non-existent

22

entity, "The XL America Insurance Group" (together with Greenwich, "Defendants"),

23

hereby answer Plaintiffs' First Amended Complaint as follows below. Because "The XL

24

America Insurance Group" is not a legal entity, all allegations as to that Defendant are

25

specifically denied. In this pleading, "Greenwich" refers only to Greenwich Insurance

26

DEFENDANTS' ANSWER AND GREENWICH'S COUNTERCLAIM       Page 1
No.: 09-00622 jcc

**Bullivant|Houser|Bailey PC**
1601 Fifth Avenue, Suite 2300
Seattle, Washington 98101-1618
Telephone: 206.292.8930

1 | Company and not to "The XL America Insurance Group."

2 | ## I. JURISDICTION

3 | 1.1    Greenwich lacks sufficient information to determine whether the amount in
4 | controversy exceeds $75,000, exclusive of interest and costs, and on that basis denies the
5 | allegations in Paragraph 1.1.  Greenwich admits that it is a citizen of a different state than
6 | that of Plaintiffs but denies that "The XL America Insurance Group" is a citizen of any state.
7 | As such, there is no jurisdiction over "The XL America Insurance Group."

8 | 1.2    Greenwich admits that it insures American Property Development, Inc.,
9 | American Capital Homes, Inc. and American Property Development of Northern California,
10 | LLC, but denies that "The XL America Insurance Group" insures any of these entities.  On
11 | information and belief, Greenwich admits that American Property Development, Inc.,
12 | American Capital Homes, Inc. and American Property Development of Northern California
13 | are organized and existing under the laws of the State of Washington and are doing business
14 | in Washington, with their principal place of business in Bellevue, Washington.

15 | 1.3    Greenwich admits that it insures Roger Kuula in his capacity as President of
16 | the Plaintiff companies and, on information and belief, admits that he is President and Owner
17 | of the Plaintiff companies and a resident in Bellevue, Washington.  Greenwich denies that
 | "The XL America Insurance Group" insures Roger Kuula.

18 | 1.4    Greenwich admits that it insures Greg Borrego in his capacity as officer of
19 | American Property Development, Inc. and, on information and belief, admits that he is Vice
20 | President of American Property Development, Inc. and a resident in Seattle, Washington.
21 | Greenwich denies that "The XL America Insurance Group" insures Greg Borrego.

22 | 1.5    Greenwich admits that it does business in Washington and is organized and
23 | existing under the laws of the State of Delaware.  Greenwich denies the remaining
24 | allegations in Paragraph 1.5.

25 | 1.6    Denied.

26 |

DEFENDANTS' ANSWER AND GREENWICH'S COUNTERCLAIM    Page 2
No.: 09-00622 jcc

**Bullivant|Houser|Bailey PC**
1601 Fifth Avenue, Suite 2300
Seattle, Washington  98101-1618
Telephone: 206.292.8930

## II. VENUE

2.1     Because Greenwich lacks sufficient information to determine whether the amount in controversy exceeds the jurisdictional limit for this Court, Greenwich denies the allegations relating to venue. To the extent that the jurisdictional limit is met, Greenwich admits that venue is appropriate in this District but denies that "The XL America Insurance Group" does business in the Western District of Washington or anywhere else. Greenwich further admits that Plaintiffs' causes of action relate to an insurance policy that was negotiated in part in this District and sold to American Capital Group, Inc. ("ACG") in this District.

## III. RELEVANT FACTS

3.1     Greenwich admits that it issued to ACG in Washington state a Private Company Reimbursement Insurance Policy that included employment practices liability insurance ("EPLI") under Policy Number ELU095285-06 for the period November 23, 2006 to November 23, 2007 (the "Policy"). Greenwich denies that the Policy includes management liability insurance coverage. Greenwich further admits that an independent wholesale insurance broker located in Washington state was involved in the contract negotiations; that the contract negotiations in part occurred in Washington state; and that the Policy was sold and issued to ACG in Washington state. Greenwich also admits that the EPLI coverage provided under the Policy contains a Limit of Liability of USD $10 million, and that American Property Development, Inc., American Capital Homes, Inc., American Property Development of Northern California, LLC ("APD Nor Cal"), Roger Kuula and Greg Borrego are "Insureds," as defined in the Policy. Finally, Greenwich admits that the Policy covers certain employment-based claims, subject to all of the Policy's terms, conditions, limitations and exclusions, and contains a Washington (State) Amendatory Endorsement. Greenwich denies any remaining allegations in Paragraph 3.1.

3.2     Greenwich admits that Paragraph 3.2 contains a partial quotation from the Insuring Agreement in the Policy but denies that Paragraph 3.2 contains a complete

DEFENDANTS' ANSWER AND GREENWICH'S COUNTERCLAIM    Page 3
No.: 09-00622 jcc

Bullivant|Houser|Bailey PC
1601 Fifth Avenue, Suite 2300
Seattle, Washington 98101-1618
Telephone: 206.292.8930

1  statement of the coverage provided by the Policy.  Greenwich otherwise refers to the terms of
2  the Policy, which speaks for itself, and denies the allegations to the extent inconsistent with
3  the Policy.

4      3.3    Greenwich admits that Paragraph 3.3 contains a partial quotation from the
5  Policy.  Greenwich otherwise refers to the terms of the Policy, which speaks for itself, and
6  denies the allegations to the extent inconsistent with the Policy.

7      3.4    Greenwich admits that Paragraph 3.4 contains a partial quotation from the
8  Policy. Greenwich otherwise refers to the terms of the Policy, which speaks for itself, and
9  denies the allegations to the extent inconsistent with the Policy.

10     3.5    Greenwich admits that, on or about September 7, 2007, a former employee of
11 APD Nor Cal, James Donovan, filed suit in California State Court against ACG, American
12 Capital Homes, Inc., American Property Development, Inc., Roger Kuula and Greg Borrego.
13 Greenwich denies that Donovan filed suit against APD Nor Cal.  Greenwich admits that the
14 lawsuit filed by Donovan (the "Donovan Action") subsequently was removed to the United
15 States District Court for the Eastern District of California, and that Donovan alleged a
16 number of causes of action in his complaint.  For a complete statement of the claims asserted
17 in the Donovan Action, Greenwich refers to the operative complaint in that action, which
18 speaks for itself, and denies the allegations in Paragraph 3.5 to the extent inconsistent with
   that complaint.

19     3.6    Greenwich admits that the Donovan Action was tendered for coverage and
20 indemnification by letter dated September 14, 2007 from ACG's retail insurance broker.  The
21 remaining allegations in Paragraph 3.6 state a legal conclusion to which no response is
22 required.

23     3.7    Greenwich admits that it acknowledged receipt of the tender by letter dated
24 September 18, 2007 to ACG's retail insurance broker and further admits that it agreed to
25 provide a defense subject to a reservation of rights by letter dated October 19, 2007 to
26 ACG's retail insurance broker.  Greenwich denies that it appointed Littler Mendelson

DEFENDANTS' ANSWER AND GREENWICH'S COUNTERCLAIM    Page 4
No.: 09-00622 jcc

**Bullivant|Houser|Bailey PC**
1601 Fifth Avenue, Suite 2300
Seattle, Washington 98101-1618
Telephone: 206.292.8930

1  ("Littler") as defense counsel.  Greenwich admits that Littler was one of Greenwich's

2  approved panel counsel during the time period relevant to this action, and that Littler has

3  been acting as attorney for the defendants in the Donovan Action.

4      3.8    Greenwich denies that from September 14, 2007, to March 23, 2009, it did not

5  issue any reservation of rights or coverage correspondence.  Greenwich denies that the

6  October 19, 2007 reservation of rights letter was not sent to Plaintiffs or their retail insurance

7  broker before March 23, 2009, but admits that, on March 23, 2009, Greenwich sent

8  Plaintiffs' retail insurance broker another copy of the reservation of rights letter dated

9  October 19, 2007.  Greenwich admits that the October 19, 2007 letter provided Plaintiffs

10  with their first written notice that Greenwich believes certain specific policy exclusions

11  apply, but denies that the document was first sent on March 23, 2009.  Greenwich denies that

12  the October 19, 2007 letter provides no explanation or analysis.  Finally, Greenich denies

13  that the October 19, 2007 reservation of rights letter was never sent to Plaintiffs.

14      3.9    Greenwich denies the first sentence in Paragraph 3.9.  Greenwich denies that

15  Plaintiffs have a "right" to *Cumis* counsel under California Civil Code section 2860, and, on

16  this basis, admits that Greenwich did not offer or provide *Cumis* counsel.  Because

17  Greenwich denies that Plaintiffs have a "right" to *Cumis* counsel, Greenwich further denies

18  that it was necessary to obtain a waiver from Plaintiffs, and, on this basis, admits that no

19  *Cumis* counsel waiver was obtained.

20      3.10   Denied.

21      3.11   Greenwich admits that it contacted Littler in January and February 2009 to

22  obtain an assessment of damages for the counts asserted in the Donovan's Action, including

23  both covered and uncovered claims.  Greenwich denies all remaining allegations in

24  Paragraph 3.11.

25      3.12   Greenwich admits that it orally informed Plaintiffs on or about April 24, 2009

26  – shortly after reviewing certain deposition transcripts only recently provided by Littler –

27  that Greenwich believed Littler may have a conflict of interest that potentially could interfere

DEFENDANTS' ANSWER AND GREENWICH'S COUNTERCLAIM    Page 5
No.: 09-00622 jcc

Bullivant|Houser|Bailey PC
1601 Fifth Avenue, Suite 2300
Seattle, Washington 98101-1618
Telephone: 206.292.8930

1   with Littler's ability to continue as defense counsel and impair its analysis of the risk of

2   exposure for liability.  Greenwich denies that it failed to explain why it believed a potential

3   conflict of interest could have interfered with Littler's ability to provide a defense or

4   assessment of the risk of exposure for liability. Greenwich denies that it currently is of the

5   view that a potential conflict of interest exists.  In response to the third and fourth sentences

6   in Paragraph 3.12, Greenwich refers to the correspondence between it and American Capital

7   for a complete statement of its position, and denies the allegations to extent inconsistent with

8   that correspondence.

9       3.13    Greenwich admits that it provided its first *written* loss allocation analysis

10  between covered and uncovered claims on May 1, 2009, which was four days before the

11  Donovan Action was scheduled for mediation; however, Greenwich had discussed its loss

12  allocation analysis orally with Plaintiffs before that date, and Greenwich's October 19, 2007

13  reservation of rights letter had informed Plaintiffs in writing that certain claims were not

14  covered based on an analysis of the allegations in the complaint.  Greenwich denies the

    remaining allegations in this paragraph.

15      3.14    Greenwich admits the first sentence and denies the second sentence of this

16  paragraph.

17      3.15    Greenwich admits that trial in the Donovan Action is scheduled to begin on

18  August 18, 2009 and, without a settlement of the Donovan Action, expert witness discovery

19  and trial preparation now will go forward.  The second sentence in Paragraph 3.15 is

20  conjecture, not fact, and hence does not require a response.  To the extent a further response

21  is deemed to be required, the allegation is denied on the basis that it misstates Greenwich's

22  position.  Greenwich denies the last sentence in Paragraph 3.15 and denies ever contending

23  that Littler has or may have an irreconcilable conflict of interest.

24      3.16    On information and belief, Greenwich admits that, in Littler's capacity as

25  defense counsel, Littler hired certain electronic discovery experts to preserve Plaintiffs'

26  electronic data in anticipation of discovery requests from Donovan.  Greenwich also admits

DEFENDANTS' ANSWER AND GREENWICH'S COUNTERCLAIM    Page 6
No.: 09-00622 jcc

1  that the cost of the work performed by the electronic discovery experts was $30,548.79, and

2  that, at Littler's request, Plaintiffs paid this amount and sought reimbursement from

3  Greenwich. Greenwich denies that it refused to pay this expense. As to the remaining

4  allegations in Paragraph 3.16, they constitute characterizations of written correspondence

5  between Greenwich and Plaintiffs (or their representatives). As such, Greenwich refers to

6  the written correspondence for a complete and accurate statement of Greenwich's position,

7  and denies the allegations to the extent inconsistent with Greenwich's written position.

8      3.17    Greenwich admits that it offered $15,000 to resolve the dispute with Plaintiffs

9  over the electronic discovery cost, and that Plaintiffs demanded payment of the offered

10  amount. Greenwich further admits that it paid the entire cost of the electronic discovery on

11  or about May 22, 2009. Greenwich denies the remaining allegations in Paragraph 3.17.

12      3.18    Greenwich admits the first sentence in Paragraph 3.18 and further admits that

13  it paid Littler's invoices for the first quarter of 2009 on or about May 22, 2009. Greenwich

14  denies the remaining allegations in Paragraph 3.18.

15      3.19    Greenwich lacks sufficient information to admit or deny the allegations in

16  Paragraph 3.19 and on that basis denies them.

17      3.20    Greenwich denies that it received a copy of the alleged May 14, 2009 letter

18  and denies that it did not respond in a timely manner to Plaintiffs' allegations of "bad faith"

19  in violation of the IFCA and CPA. The remaining allegations in Paragraph 3.20 contain

20  legal conclusions to which no response is required.

### IV.  FIRST CAUSE OF ACTION – DECLARATORY JUDGMENT (28 U.S.C. § 2201) RE CHOICE OF LAW (THE LAW OF THE CASE)

22      4.1    Greenwich re-alleges all of its preceding responses to Plaintiffs' allegations.

23      4.2    The first sentence in Paragraph 4.2 is a statement of Plaintiffs' contention

24  regarding choice of law to which no response is required. To the extent a further response is

25  deemed to be required, Greenwich denies the allegation. Greenwich denies that the second

26  sentence in Paragraph 4.2 is an accurate statement of Greenwich's position.

DEFENDANTS' ANSWER AND GREENWICH'S COUNTERCLAIM    Page 7
No.: 09-00622 jcc

**Bullivant|Houser|Bailey PC**
1601 Fifth Avenue, Suite 2300
Seattle, Washington 98101-1618
Telephone: 206.292.8930

1    4.3    Paragraph 4.3 is a statement of Plaintiffs' request for declaratory relief to

2    which no response is required. To the extent a further response is deemed to be required,

3    Greenwich denies that Plaintiffs are entitled to the relief they seek.

### V. SECOND CAUSE OF ACTION – DECLARATORY JUDGMENT (28 U.S.C. § 2201) RE. COVERAGE

5    5.1    Greenwich re-alleges all of its preceding responses to Plaintiffs' allegations.

6    5.2    Paragraph 5.2 is a statement of Plaintiffs' request for declaratory relief to

7    which no response is required. To the extent a further response is deemed to be required,

8    Greenwich denies that Plaintiffs are entitled to the relief they seek.

9    5.3    Paragraph 5.3 is a statement of Plaintiffs' request for declaratory relief

10   regarding various alleged "coverage disputes" to which no response is required. To the

11   extent a further response is deemed to be required, Greenwich denies that Plaintiffs are

12   entitled to the relief they seek.

13   5.4    Greenwich admits only that "coverage questions do exist." The remaining

14   allegations in Paragraph 5.3 state legal conclusions to which no response is required. To the

15   extent a further response is deemed to be required, Greenwich denies that a declaratory

16   judgment action is an appropriate mechanism to determine the coverage questions in the

17   circumstances of this case.

### VI. THIRD CAUSE OF ACTION – BREACH OF CONTRACT

19   6.1    Greenwich re-alleges all of its preceding responses to Plaintiffs' allegations.

20   6.2    Paragraph 6.2 states a legal conclusion to which no response is required. To

21   the extent a further response is deemed to be required, Greenwich denies the allegation.

22   6.3    Denied.

23   6.4    Paragraph 6.4 is a statement of Plaintiffs' alleged damages to which no

24   response is required. To the extent a further response is deemed to be required, Greenwich

25   denies that Plaintiffs are entitled to the damages they seek.

DEFENDANTS' ANSWER AND GREENWICH'S COUNTERCLAIM    Page 8
No.: 09-00622 jcc

Bullivant|Houser|Bailey PC
1601 Fifth Avenue, Suite 2300
Seattle, Washington 98101-1618
Telephone: 206.292.8930

## VII. FOURTH CAUSE OF ACTION – BAD FAITH CLAIMS HANDLING

7.1    Greenwich re-alleges all of its preceding responses to Plaintiffs' allegations.

7.2    Paragraph 7.2 is a statement of Plaintiffs' contention regarding Greenwich's alleged conduct to which no response is required. To the extent a further response is deemed to be required, Greenwich denies that it has committed any "bad faith claims handling" and denies that Plaintiffs are entitled to the damages they seek.

## VIII. FIFTH CAUSE OF ACTION – CONSUMER PROTECTION ACT VIOLATIONS

8.1    Greenwich re-alleges all of its preceding responses to Plaintiffs' allegations.

8.2    Paragraph 8.2 is a statement of Plaintiffs' contention regarding Greenwich's alleged violation of Washington's Consumer Protection Act, RCW 19.86 et seq. and Plaintiffs' alleged entitlement to damages to which no response is required. To the extent a further response is deemed to be required, Greenwich denies that it has violated the Consumer Protection Act and denies that Plaintiffs are entitled to the damages they seek.

## IX. SIXTH CAUSE OF ACTION –VIOLATION OF RCW 48.30.015

9.1    Greenwich re-alleges all of its preceding responses to Plaintiffs' allegations.

9.2    Paragraph 9.2 is a statement of Plaintiffs' contention regarding Greenwich's alleged violation of RCW 48.30.015 and Washington Administrative Code 284-30-330, 350, 360, 370 and 380 and Plaintiffs' alleged entitlement to damages to which no response is required. To the extent a further response is deemed to be required, Greenwich denies that it has violated these provisions and denies that Plaintiffs are entitled to the damages they seek.

## X. RESERVATION OF RIGHTS

10.1    Greenwich re-alleges all of its preceding responses to Plaintiffs' allegations.

10.2    Paragraph 10.2 purports to be a reservation of rights to which no response is required. To the extent that a further response is deemed to be required, Greenwich denies that a "Reservation of Rights" is a justiciable cause of action.

Bullivant|Houser|Bailey PC

1601 Fifth Avenue, Suite 2300
Seattle, Washington 98101-1618
Telephone: 206.292.8930

## XI.  PRAYER FOR RELIEF

Section XI. states Plaintiffs' prayer for relief to which no response is necessary.  To the extent a further response is deemed to be required, Greenwich denies that Plaintiffs are entitled to any of the relief they seek.

Defendants deny each and every allegation in the First Amended Complaint that is not specifically admitted, including, without limitation, all numbered, unnumbered and/or mis-numbered paragraphs.

## XII.  AFFIRMATIVE DEFENSES

As and for affirmative defenses, Defendants allege as follows:

1.    Plaintiffs' Complaint fails to state a claim upon which relief may be granted.

2.    Plaintiffs' causes of action are premature, not ripe and/or not justiciable.

3.    Plaintiffs causes of action are barred because Greenwich at all times has acted reasonably and in good faith, and in conformance with its obligations under the Policy and applicable law.

4.    Plaintiffs' causes of action are barred because Plaintiffs have not suffered any harm as a result of any actions by Greenwich.

5.    Plaintiffs' causes of action are barred to the extent that Plaintiffs have failed to mitigate, minimize or avoid their own damages.

6.    Coverage for the Donovan Action may be barred or limited because Plaintiffs have breached or failed to comply with all of the terms and conditions of the Policy, including without limitation the Plaintiffs' contractual obligation to provide Greenwich with all information, assistance and cooperation that it may reasonably request and not to do anything which in any way increases Greenwich's exposure under the Policy or prejudices Greenwich's potential or actual rights of recovery.

7.    Under the Policy, Greenwich is entitled to an allocation between covered Loss (not including Defense Expenses) and uncovered matters asserted in the Donovan Action

DEFENDANTS' ANSWER AND GREENWICH'S COUNTERCLAIM    Page 10
No.: 09-00622 jcc

Bullivant|Houser|Bailey PC
1601 Fifth Avenue, Suite 2300
Seattle, Washington 98101-1618
Telephone: 206.292.8930

1 based on the relative legal exposure to the parties presented by covered and uncovered
2 matters.

3    8.    Coverage for the Donovan Action is barred or limited to the extent that it seeks
4 recovery for any actual or alleged violation of the National Labor Relations Act, the Fair
5 Labor Standards Act or any rule or regulation promulgated thereunder, or any similar federal,
6 state, local or common law or regulation.

7    9.    Coverage for the Donovan Action is barred or limited to the extent that it seeks
8 recovery for amounts arising from any actual or alleged liability of the "Company," as
9 defined in the Policy, under any express contract or agreement.

10    10.    Coverage for the Donovan Action is barred or limited to the extent that it seeks
11 recovery of amounts that do not constitute "Loss," as that term is defined by the Policy,
12 including but not limited to any liability that is uninsurable by law, or constitutes fines,
13 penalties or taxes imposed by law.

14    11.    Coverage for the Donovan Action is barred or limited to the extent that other
15 insurance policies provide coverage for that action.

16    12.    Coverage for the Donovan Action may be barred or limited by other terms,
17 conditions, limitations and exclusions contained in the Policy.

18    13.    There is no coverage under the Policy for fees or expenses that are not
19 reasonable and necessary, reflect corporate expenses and/or are not related to the defense of a
20 covered Claim, including but not limited to any fees and expenses incurred in Plaintiffs'
21 pursuit of affirmative claims against Donovan.

22    14.    Plaintiffs' causes of action are barred in whole or in part by the doctrines of
23 unclean hands, estoppel, waiver and/or laches.

24    15.    Greenwich presently has insufficient knowledge and information upon which
25 to form a belief as to whether it may have additional, as yet unstated, affirmative defenses
26 available to it. Furthermore, Plaintiffs have failed to provide sufficient specificity in the
allegations of the First Amended Complaint to permit a full response. Greenwich, therefore,

DEFENDANTS' ANSWER AND GREENWICH'S COUNTERCLAIM    Page 11
No.: 09-00622 jcc

Bullivant|Houser|Bailey PC
1601 Fifth Avenue, Suite 2300
Seattle, Washington 98101-1618
Telephone: 206.292.8930

1  reserves its right to assert additional affirmative defenses in the event discovery or

2  investigation indicates it would be appropriate to do so.

### XIII.  PRAYER FOR RELIEF

4        WHEREFORE, Defendants pray as follows:

5        1.      That Plaintiffs take nothing by way of their First Amended Complaint;

6        2.      For costs of suit;

7        3.      For attorneys' fees; and

8        4.      For such other and further relief as the Court deems just and proper.

### XIV.  COUNTERCLAIM OF GREENWICH INSURANCE COMPANY

11       For its Counterclaim, Greenwich hereby states and alleges the following:

12  A.   **Nature of the Action**

13       1.      Greenwich brings this Counterclaim pursuant to Federal Rule of Civil

14  Procedure 13(a), and the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, for

15  a declaratory judgment regarding its rights and obligations, if any, to Counterclaim-

16  Defendants American Capital Homes, Inc., American Property Development, Inc., American

17  Property Development of Northern California, LLC, Roger Kuula and Greg Borrego

18  (collectively, "American Capital") under Private Company Reimbursement Insurance Policy

19  Number ELU095285-06 issued to American Capital for the period November 23, 2006 to

20  November 23, 2007 (the "Policy").

21       2.      American Capital has sought coverage under the Policy for an underlying

22  lawsuit filed by James C. Donovan ("Donovan"), captioned *Donovan v. American Capital*

23  *Group, et al.*, Case No. 07-CV-2160 (E.D. Cal.) (the "Donovan Action"), which Greenwich

24  is defending subject to a reservation of rights.

25       3.      As explained further below, American Capital has breached its duty to

26  cooperate with Greenwich in the defense and settlement of the Donovan Action.  Among

DEFENDANTS' ANSWER AND GREENWICH'S COUNTERCLAIM    Page 12    **Bullivant|Houser|Bailey PC**
No.: 09-00622 jcc
1601 Fifth Avenue, Suite 2300
Seattle, Washington 98101-1618
Telephone: 206.292.8930

1  other things, American Capital summarily has refused to discuss with Greenwich the

2  appropriate allocation between covered and uncovered amounts that would need to be paid to

3  settle the Donovan Action – even though the Policy expressly requires such an allocation.

4  As a result of this and other conduct by American Capital, Greenwich is unable to settle the

5  Donovan Action.

6      4.    Greenwich has been prejudiced by American Capital's breach of cooperation

7  because Greenwich will continue to incur the expense of defending the Donovan Action so

8  long as the case does not settle. Furthermore, if the Donovan Action does not settle and an

9  adverse judgment is entered against American Capital, Greenwich potentially could be

10  exposed to greater liability for the judgment than it would have paid in settlement.

11     5.    Because of American Capital's breach of cooperation and the resulting

12  prejudice to Greenwich, it is relieved of any obligation under the Policy it otherwise may

13  have had to pay further Loss, including Defense Expenses, in connection with the Donovan

14  Action and is entitled to the recovery of damages from American Capital.

**B.    Jurisdiction**

15     6.    This Counterclaim is brought under Rule 13(a) of the Federal Rules of Civil

16  Procedure.

17  **C.    The Parties**

18     7.    Greenwich is an insurance company organized under the laws of Delaware

19  with its principal place of business in Stamford, Connecticut

20     8.    On information and belief, American Capital Homes, Inc. ("ACH") is a

21  corporation organized under the laws of Washington state with its principal place of business

22  in Washington state.

23     9.    On information and belief, American Property Development, Inc. ("APD") is a

24  corporation organized under the laws of Washington state with its principal place of business

25  in Washington state.

26

DEFENDANTS' ANSWER AND GREENWICH'S COUNTERCLAIM       Page 13
No.: 09-00622 jcc

Bullivant|Houser|Bailey PC

1601 Fifth Avenue, Suite 2300
Seattle, Washington 98101-1618
Telephone: 206.292.8930

10.     On information and belief, American Property Development of Northern California, LLC. ("APD-NC") is a limited liability company organized under the laws of Washington state with its principal place of business in Washington state.

11.     On information and belief, Roger Kuula is an individual residing in the state of Washington and is the Owner and President of ACH, APD and APD-NC.

12.     On information and belief, Greg Borrego is an individual residing in the state of Washington and is the Vice President of APD.

**D.     Factual Allegations**

**1.     The Policy**

13.     Greenwich issued the Policy to American Capital Group, Inc. ("ACG") for the policy period November 23, 2006 to November 23, 2007.  A true and correct copy of the Policy is attached as Exhibit A (pgs. 22-59) to this Counterclaim.

14.     The Policy includes an Employment Practices Liability ("EPLI") Coverage Part with a $10 million Maximum Aggregate Limit of Liability for each Policy Period, inclusive of Defense Expenses, for all Claims under the EPLI coverage part, subject to a $10 million Maximum Aggregate Limit of Liability for all Claims under the Policy.  Coverage also is subject to a $35,000 retention for each Claim under the Employment Practices Liability Coverage Part.

15.     The EPLI coverage part provides coverage for Loss resulting from a Claim first made against the Insureds during the Policy Period or, if applicable, the Optional Extension Period, for a Wrongful Act.

16.     ACH, APD and APD-NC are Insureds under the Policy because each entity is a "Company," as defined in the Policy.

17.     Mr. Kuula and Mr. Borrego also are Insureds because they are "Insured Persons," as defined in the EPLI coverage part, insofar as they are directors, officers and/or employees of ACG or its Subsidiaries.

DEFENDANTS' ANSWER AND GREENWICH'S COUNTERCLAIM          Page 14
No.: 09-00622 jcc

**Bullivant|Houser|Bailey PC**
1601 Fifth Avenue, Suite 2300
Seattle, Washington 98101-1618
Telephone: 206.292.8930

18.    "Loss" is defined in the Policy's General Terms and Conditions as damages, judgments, settlements or other amounts (including punitive or exemplary damages where insurable by law) in excess of the Retention that the Insured is obligated to pay, including Defense Expenses, whether incurred by the Insurer or the Insured.  Loss does not include, however, among other things, matters which are uninsurable under the law pursuant to which the Policy is construed and fines, penalties or taxes imposed by law.

19.    "Wrongful Act" is defined in the EPLI coverage part.  In potentially relevant part, the Policy defines Wrongful Act to include:

    (1)    wrongful termination of employment whether actual or constructive;

       . . .

    (4)    wrongful deprivation of career opportunity, negligent supervision, failure to grant tenure, employment related misrepresentations, retaliatory treatment against an employee of the Company, failure to promote, demotion, wrongful discipline or evaluation, or negligent . . . refusal to hire; [and]

    (5)    employment related libel, slander, humiliation, defamation or invasion of privacy . . . .

20.    Under the EPLI coverage part, coverage is subject to several exclusions applicable here.

21.    First, the Policy excludes from coverage any actual or alleged violation of the National Labor Relations Act or Fair Labor Standards Act, including any amendments thereto or any rule of regulation promulgated thereunder, or any similar federal, state, local or common law or regulation.

22.    Second, the Policy excludes from coverage any Claim against any Insured arising from any actual or alleged liability of the Company under any "express contract or agreement," which is defined as an actual agreement of the parties, the terms of which are openly set forth or declared at the time of making in clear or distinct language; however, the

DEFENDANTS' ANSWER AND GREENWICH'S COUNTERCLAIM    Page 15
No.: 09-00622 jcc

1    exclusion does not apply to the extent than an Insured would have been liable in the absence

2    of such express contract or agreement..

3        23.    Where, as here, a Claim includes both covered and uncovered matters,

4    Greenwich and the Insureds agree to allocate all losses, other than Defense Expenses,

5    between covered Loss and uncovered loss on the basis of the relative legal exposures of the

6    parties to the covered and uncovered matters.

7        24.    Furthermore, under the Policy, the Insured must provide Greenwich with all

8    information, assistance and cooperation that it may reasonably request, and may not do

9    anything that in any way increases Greenwich's exposure under the Policy or that prejudices

10   Greenwich's potential or actual rights of recovery.

11   **2.    The Donovan Action**

12       25.    On or about September 7, 2007, James Donovan filed the Donovan Action in

13   California state court against ACH, APD, ACG, Mr. Kuula and Mr. Borrego (but not APD-

14   NC). These defendants removed the Donovan Action to federal court, where it was assigned

15   Case No. 2:07-cv-02160.

16       26.    The complaint in the Donovan action asserts claims for breach of contract

17   (including a bonus and profit sharing plan), unlawful collection of wages previously paid,

18   waiting time penalties, breach of the covenant of good faith and fair dealing, unfair

19   competition, wrongful termination and defamation.

20       27.    American Capital retained Littler Mendelson ("Littler") as defense counsel in

21   the Donovan Action. Pursuant to Endorsement No. 11, Litter was pre-approved as defense

22   counsel for Claims under the Policy.

23       28.    American Capital's retail broker tendered the Donovan Action to Greenwich

24   on or about September 14, 2007.

25       29.    By letter dated September 17, 2007, addressed to American Capital's retail

26   broker, Greenwich acknowledged receipt of the Donovan Action and reserved its rights

DEFENDANTS' ANSWER AND GREENWICH'S COUNTERCLAIM    Page 16    **Bullivant|Houser|Bailey PC**
No.: 09-00622 jcc

1601 Fifth Avenue, Suite 2300
Seattle, Washington 98101-1618
Telephone: 206.292.8930

1  generally in connection with the Claim. A true and correct copy of this letter is attached as

2  Exhibit B (pg. 60).

3      30.    Greenwich followed its initial acknowledgement with a more complete

4  assessment of coverage by letter mailed to American Capital's retail broker on October 19,

5  2007. A true and correct copy of this letter is attached as Exhibit C (pgs. 61-62).

6      31.    Among other things, Greenwich's October 19, 2007 letter informed

7  American Capital that indemnity coverage would not be available for amounts allegedly due

8  to Donovan for violations of the California labor laws, breach of the bonus and profit sharing

9  plan, withheld compensation, waiting time penalties or other matters that do not constitute

10 "Loss" under the Policy. Greenwich also approved American Capital's retention of Littler as

11 defense counsel.

12     32.    Greenwich has been defending the defendants in the Donovan Action pursuant

13 to this reservation of rights.

14     33.    In the first quarter of 2009, Greenwich asked Littler to analyze the liability and

15 damages exposure for the various counts in the Donovan Action in anticipation of settlement

16 discussions and/or mediation. Littler provided the requested liability and damages analysis

   to Greenwich and to American Capital in March 2009

17     34.    A mediation in the Donovan Action was scheduled for May 5, 2009 in

18 Sacramento, California. As American Capital's insurer, Greenwich was asked to attend the

19 mediation in person.

20     35.    Because the Donovan Action included both covered and uncovered matters, an

21 allocation of any settlement reached at the mediation would be required under the Policy. As

22 such, Greenwich and American Capital discussed allocation in preparation for the mediation

23 and, on May 1, 2009, exchanged written allocation proposals for settlement of the Donovan

24 Action.

25     36.    Greenwich and American Capital continued to discuss allocation with each

26 other and with the mediator on May 5, 2009.

Bullivant|Houser|Bailey PC
1601 Fifth Avenue, Suite 2300
Seattle, Washington 98101-1618
Telephone: 206.292.8930

1      37.    After receiving Donovan's opening demand at the mediation, Greenwich and

2 American Capital agreed to make a counteroffer, which reflected the parties' agreed upon

3 allocation. Although Donovan responded to this counteroffer, there was insufficient time for

4 Greenwich and American Capital to present a further offer.

5      38.    Although the May 5, 2009 mediation ended without a settlement, Greenwich

6 believed that settlement discussions would continue between it, American Capital and

7 Donovan. To that end, the mediator advised that he would make himself available to the

8 parties should they wish to continue the mediation at a future time.

9      39.    Instead of continuing to engage in the negotiation process, American Capital

10 filed this lawsuit the day after the mediation.

11      40.    Since the mediation, Greenwich has approached American Capital to discuss

12 allocation and settlement of the Donovan Action, but American Capital has refused to

13 consider any allocation between covered and uncovered losses.

14      41.    Even after the mediation ended and American Capital had filed its coverage

15 action, settlement of the Donovan Action remained within the parties' reach. Indeed,

16 Donovan's counsel – who had located American Capital's coverage complaint on Pacer –

17 contacted Greenwich and advised that his client would reduce the last demand he made at the

mediation in an effort to further settlement discussions.

18      42.    Greenwich promptly informed American Capital of this breakthrough with

19 Donovan and asked to discuss a counterproposal with American Capital and Littler.

20      43.    Once again, American Capital spurned any attempt to negotiate allocation.

21      44.    Without American Capital's agreement to pay the fair share of the settlement

22 attributable to uncovered losses – in other words, losses for which it paid no premium to

23 Greenwich – the Donovan Action cannot be settled.

24      45.    American Capital also has asserted that Greenwich must pay for uncovered

25 fees and expenses incurred by American Capital in prosecuting an affirmative claim against

26 Donovan before American Capital would agree to settle the Donovan Action.

DEFENDANTS' ANSWER AND GREENWICH'S COUNTERCLAIM    Page 18    **Bullivant|Houser|Bailey PC**
No.: 09-00622 jcc                                      1601 Fifth Avenue, Suite 2300
Seattle, Washington 98101-1618
Telephone: 206.292.8930

46.    In other words, American Capital has conditioned settlement of the Donovan Action on Greenwich's payment of uncovered matters – both uncovered losses asserted in the Donovan Action and the uncovered fees and expenses incurred in prosecuting affirmative claims.

47.    As a direct result of American Capital's refusal to discuss allocation with Greenwich and its insistence that Greenwich pay fees and expenses for matters unrelated to the defense of this Claim, the Donovan Action has not settled and seems unlikely to settle before trial is scheduled to begin on August 18, 2009.

48.    Consequently, Greenwich will continue to incur defense expenses through trial and possible appeal, and Greenwich potentially will be exposed to a judgment that exceeds the amount that Donovan would accept in settlement.

**E.    Counterclaim for Breach of Contract Based on American Capital's Failure to Cooperate with Greenwich**

49.    Greenwich incorporates all preceding allegations as though fully set forth below.

50.    As a condition of coverage, the Policy requires that American Capital cooperate with Greenwich and refrain from taking any action that would prejudice Greenwich or increase Greenwich's exposure under the Policy.

51.    Furthermore, the Policy expressly requires allocation between covered Loss and uncovered losses, other than Defense Expenses, based on the relative legal exposures of the parties to covered and uncovered matters.

52.    American Capital has breached its contractual duty to cooperate by, among other things, refusing to engage in any discussion with Greenwich regarding allocation of uncovered Loss and by insisting that Greenwich pay for uncovered matters.

53.    As a result of Greenwich's breach of cooperation, Greenwich has suffered and will continue to suffer actual prejudice.

DEFENDANTS' ANSWER AND GREENWICH'S COUNTERCLAIM          Page 19
No.: 09-00622 jcc

54.     Because American Capital has breached its contractual duty to cooperate with Greenwich, there is no coverage under the Policy for any judgment entered in the Donovan Action, and Greenwich is entitled to recover from American Capital all Defense Expenses incurred after May 5, 2009 in connection with the Donovan Action.

## XV.  JURY DEMAND

Defendants hereby request a trial by jury.

## XVI.  GREENWICH'S PRAYER FOR RELIEF

WHEREFORE, Greenwich respectfully requests:

1.     A declaration that American Capital has breached the Policy by failing to cooperate with Greenwich, and that Greenwich, therefore, has no obligation under the Policy to cover any judgment entered in the Donovan Action and can recover from American Capital all Defense Expenses incurred from May 6, 2009 to the present;

2.     An award of costs, attorneys' fees, expenses and such other and further relief as this Court may deem just and proper.

DATED:  July 14, 2009

Bullivant Houser Bailey PC


/s/ Matthew J. Sekits
Matthew J. Sekits, WSBA #26175
E-Mail: matthew.sekits@bullivant.com
Toni Y. Anders, WSBA #31238
E-Mail: toni.anders@bullivant.comAttorneys
for Defendants
Bullivant Houser Bailey PC
1601 Fifth Avenue, Suite 2300
Seattle, Washington  98101-1618
206.292.8930

1

## CERTIFICATE OF SERVICE

2      I hereby certify that on July 14, 2009, a true and correct copy of the foregoing

3   document was served on the following:

| | |
|---|---|
| 4   John E.D. Powell<br>Cairncross & Hempelmann, P.S.<br>5   524 Second Ave., Ste. 500<br>Seattle, WA  98104-2323<br>6 | ☐ U.S. Mail<br>☐ Facsimile<br>☐ Hand Delivery<br>☒ Electronic Email |

7

8      Dated July 14, 2009 at Seattle, Washington.

9

10   _____
     Kimberl y Vergin

11   11753920.1

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DEFENDANTS' ANSWER AND GREENWICH'S COUNTERCLAIM          Page 21
No.: 09-00622 jcc

**Bullivant|Houser|Bailey PC**
1601 Fifth Avenue, Suite 2300
Seattle, Washington 98101-1618
Telephone: 206.292.8930

Policy Number:    ELU095288 
Renewal of Number

**Green___ch Insurance Company**
A Member of the XL America Companies

| PRIVATE COMPANY REIMBURSEMENT INSURANCE POLICY DECLARATIONS |
|---|

Executive Offices
70 Seaview Avenue
Stamford, CT 06902-6040
Telephone 877-953-2636

THIS IS A CLAIMS MADE POLICY. EXCEPT AS OTHERWISE PROVIDED HEREIN, THIS POLICY ONLY APPLIES TO CLAIMS FIRST MADE DURING THE POLICY PERIOD OR, IF APPLICABLE, THE OPTIONAL EXTENSION PERIOD. THE LIMIT OF LIABILITY AVAILABLE TO PAY DAMAGES OR SETTLEMENTS SHALL BE REDUCED AND MAY BE EXHAUSTED BY THE PAYMENT OF DEFENSE EXPENSES. THIS POLICY PROVIDES FOR THE INSURER TO DEFEND ANY CLAIM MADE AGAINST AN INSURED EXCEPT UNDER THOSE CERTAIN SPECIFIED CIRCUMSTANCES WHERE THE INSURED CHOOSES TO PROVIDE ITS OWN DEFENSE. PLEASE READ AND REVIEW THE POLICY CAREFULLY.

**Item 1. Name and Mailing Address of Parent Company:**

American Capital Group
110 110th Avenue NE
Suite 550
Bellevue, WA 98004

**Item 2. Policy Period:** From: November 23, 2006 To: November 23, 2007
At 12:01AM Standard Time at your Mailing Address Shown Above

**Item 3. Limits of Liability; Coverage Parts:**

(a)    N/A    Maximum Aggregate Limit of Liability each Policy Period (including Defense Expenses) for all Claims under the Management Liability and Company Reimbursement Coverage Part

(b)    $10,000,000    Maximum Aggregate Limit of Liability each Policy Period (including Defense Expenses) for all Claims under the Employment Practices Liability Coverage Part

(c)    N/A    Maximum Aggregate Limit of Liability each Policy Period (including Defense Expenses) for all Claims under the Pension and Welfare Benefit Plan Fiduciary Liability Coverage Part

(d)    $10,000,000    Maximum Aggregate Limit of Liability (including Defense Expenses) for all Claims under the Policy

NOTE: If there is no Limit for a Coverage Part, no coverage is available under that Coverage Part.

**Item 4. Retentions:**

(a)    N/A    each Insured Person under INSURING AGREEMENT I (A) of the Management Liability and Company Reimbursement Coverage Part

(b)    N/A    each Claim under INSURING AGREEMENT I (B) of the Management Liability and Company Reimbursement Coverage Part

(c)    $35,000    each Claim under the Employment Practices Liability Coverage Part

(d)    N/A    each Claim under the Pension and Welfare Benefit Plan Fiduciary Liability Coverage Part

**Item 5. Optional Extension Period:**

Premium for One Year Optional Extension Period:    $52,000
Premium for Two Year Optional Extension Period:    N/A

**Item 6. Pending and Prior Proceeding Date(s):**

(a)    N/A    for the Management Liability and Company Reimbursement Coverage Part
(b)    See Endorsement    for the Employment Practices Liability Coverage Part
(c)    N/A    for the Pension and Welfare Benefit Plan Fiduciary Liability Coverage Part

PC 70 00 11 01

Page 1 of 2

A22

## PRIVATE COMPANY REIMBURSEMENT INSURANCE POLICY DECLARATIONS

**Item 7. Notices required to be given to the Insurer must be addressed to:**

Executive Liability Underwriters
One Constitution Plaza, 16th Floor
Hartford, CT  06103
Toll Free Telephone: 877-953-2636

**Item 8. Premium:**

| | |
|---|---|
| Taxes, Surcharges or Fees: | $0.00 |
| Total Policy Premium: | $52,000.00 |

**Item 9. Policy Form and Endorsements Attached at Issuance:**

PC 71 00 03 00   PC 71 02 03 00   XL 80 39 04 05   XL 80 24 03 03   PC 72 10 07 01   PC 80 298 08 06
PC 80 300 08 06   PC 80 18 08 00   PC 83 19 11 01   PC 80 23 05 00   XL 80 50 08 06   PC 80 287 07 06
PC 80 177 03 06

Countersigned: _____  By: _____
                          Date                                      Authorized Representative

THESE DECLARATIONS AND THE POLICY, WITH THE ENDORSEMENTS, ATTACHMENTS, AND THE APPLICATION SHALL CONSTITUTE THE ENTIRE AGREEMENT BETWEEN THE INSURER AND THE INSURED RELATING TO THIS INSURANCE.

In Witness Whereof, the Insurer has caused this Policy to be executed by its authorized officers, but this Policy will not be valid unless countersigned on the Declarations page, if required by law, by a duly authorized representative of the Insurer.

Nicholas M. Brown, Jr.
President

Theresa M. Morgan
Secretary

**Greenwich Insurance Company**

PC 70 00 11 01

A23

PRIVATE COMPANY REIMBURSEMENT INSURANCE POLICY
PC 71 00 03 00

# GENERAL TERMS AND CONDITIONS

**THIS IS A CLAIMS MADE POLICY WITH DEFENSE EXPENSES INCLUDED IN THE LIMIT OF LIABILITY. PLEASE READ AND REVIEW THE POLICY CAREFULLY.**

In consideration of the payment of the premium, and in reliance on all statements made and information furnished to Executive Liability Underwriters, the Underwriting Manager for the Insurer identified in the Declarations (hereinafter the Insurer), including the Application, and subject to all of the terms, conditions and limitations of all of the provisions of this Policy, the Insurer, the Insured Persons and the Company agree as follows:

**I.      DEFENSE OBLIGATIONS**

The Insurer has the right and duty to defend any **Claim** against any **Insured** covered under this Policy, even if such **Claim** is false, fraudulent or groundless.

**II.     GENERAL DEFINITIONS**

(A)     "**Application**" means:

   (1)      the application attached to and forming part of this Policy; and

   (2)      any materials submitted therewith, which shall be retained on file by the Insurer and shall be deemed to be physically attached to this Policy.

(B)     "**Change in Control**" means:

   (1)      the merger or acquisition of the **Parent Company**, or of all or substantially all of its assets by another entity such that the **Parent Company** is not the surviving entity;

   (2)      the acquisition by any person, entity or affiliated group of persons or entities of the right to vote, select or appoint more than fifty percent (50%) of the directors of the **Parent Company**; or

   (3)      the appointment of a Receiver, Conservator, Liquidator, Trustee, Rehabilitator, or any comparable authority, with respect to the **Parent Company**.

(C)     "**Claim**" means:

   (1)      any written notice, including any request to toll or waive a statute of limitations;

   (2)      any civil proceeding in a court of law or equity, or arbitration; or

   (3)      any criminal proceeding which is commenced by the return of an indictment.

(D)     "**Company**" means the **Parent Company** and any **Subsidiary** created or acquired on or before the Inception Date set forth in ITEM 2 of the Declarations or during the **Policy Period**, subject to GENERAL CONDITIONS (F).

(E)     "**Defense Expenses**" means reasonable legal fees and expenses incurred in the defense of any **Claim** including the premium for an appeal bond, attachment bond or similar bond but will not include applying for or furnishing such bond. **Defense Expenses** will not include the **Company's** overhead expenses or any salaries, wages, fees, or benefits of its directors, officers, trustees or employees.

PC 71 00 03 00                                                                      Page 1 of 7

A24

PRIVATE COMPANY REIMBURSEMENT INSURANCE POLICY
PC 71 00 03 00

(F)    "**Insured**" shall have the meaning given to that term in each Coverage Part attached hereto.

(G)    "**Insured Person**" shall have the meaning given to that term in each Coverage Part attached hereto.

(H)    "**Interrelated Wrongful Acts**" means Wrongful Acts which are based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any of the same or related or series of related facts, circumstances, situations, transactions or events.

(I)    "**Loss**" means damages, judgments, settlements or other amounts (including punitive or exemplary damages where insurable by law) in excess of the Retention that the **Insured** is obligated to pay, including **Defense Expenses**, whether incurred by the Insurer or the **Insured**.  Loss will not include:

    (1)    the multiplied portion of any damage award;

    (2)    matters which are uninsurable under the law pursuant to which this Policy is construed; and

    (3)    fines, penalties or taxes imposed by law.

NOTE: With respect to judgments in which punitive damages are awarded, the coverage provided by this Policy shall apply to the broadest extent permitted by law.  If, based on the written opinion of counsel for the **Insured**, punitive damages are insurable under applicable law the Insurer will not dispute the written opinion of counsel for the **Insured**.

(J)    "**Parent Company**" means the entity named in ITEM 1 of the Declarations.

(K)    "**Policy Period**" means the period from the Inception Date to the Expiration Date set forth in ITEM 2 of the Declarations or to any earlier cancellation date.

(L)    "**Subsidiary**" means any entity during any time in which the **Parent Company** owns, directly or through one or more **Subsidiaries**, more than fifty percent (50%) of the outstanding securities representing the present right to vote for the election of such entity's directors.

(M)    "**Wrongful Act**" shall have the meaning given to that term in each Coverage Part attached hereto.

III.    **GENERAL CONDITIONS**

(A)    **LIMITS OF LIABILITY AND RETENTIONS**

    (1)    The amounts set forth in ITEM 3 (a) – (c) of the Declarations as the Maximum Aggregate Limit of Liability for each Coverage Part shall be the Maximum Aggregate Limit of Liability of the Insurer under such Coverage Part for all **Loss**, including **Defense Expenses**, from all **Claims** made or deemed made under such Coverage Part during the **Policy Period**.  Each such amount shall be part of, and not in addition to, the amount set forth in ITEM 3 (d) of the Declarations, which amount is the Maximum Aggregate Limit of Liability of the Insurer under all Coverage Parts for all **Loss**, including **Defense Expenses**, from all **Claims** for which this Policy provides coverage.

    (2)    **Defense Expenses** incurred by the Insurer or by the **Insured** in defense of a **Claim** will be part of and not in addition to the Limits of Liability, and payment of **Defense Expenses** by the Insurer will reduce and may exhaust all applicable Limits of Liability.

    (3)    If coverage is available for a **Claim** under more than one Coverage Part, the maximum applicable Limit of Liability for such **Claim** shall be the largest applicable remaining Limit of Liability under only one of the applicable Coverage Parts.

PC 71 00 03 00



PRIVATE COMPANY REIMBURSEMENT INSURANCE POLICY
PC 71 00 03 00

(4)     With respect to a **Claim** under any applicable Coverage Part, the Insurer shall only pay **Loss** which is in excess of the amount set forth in ITEM 4 of the Declarations as the Retention applicable to each **Claim** under the applicable Coverage Part. If different Retentions are applicable to different parts of any **Loss** under this Policy, the applicable Retention will be applied separately to each part of such **Loss**, and the sum of such Retentions will not exceed the largest applicable Retention set forth in ITEM 4 of the Declarations.

(B)     **DEFENSE, ALLOCATION OF LOSS AND SETTLEMENT**

(1)     If both **Loss** covered by this Policy and loss not covered by this Policy are incurred, either because a **Claim** made against the **Insured** contains both covered and uncovered matters, or because a **Claim** is made against both the **Insured** and others not insured under this Policy, the **Insured** and the Insurer will use their best efforts to determine a fair and appropriate allocation of **Loss** between that portion of **Loss** that is covered under this Policy and that portion of **Loss** that is not covered under this Policy.

(2)     No **Insured** may incur any **Defense Expenses** or admit any liability for, make any settlement offer with respect to, or settle any **Claim** without the Insurer's consent, such consent not to be unreasonably withheld. The Insurer will have the right to make investigations and conduct negotiations and, with the consent of the **Insured**, enter into such settlement of any **Claim** as the Insurer deems appropriate. If the **Insured** refuses to consent to a settlement acceptable to the claimant in accordance with the Insurer's recommendation, then, subject to the Limit of Liability for any applicable Coverage Part and the Maximum Aggregate Limit of Liability for the Policy as set forth in ITEM 3 of the Declarations, the Insurer's liability for such **Claim** will not exceed:

(a)     the amount for which such **Claim** could have been settled by the Insurer plus **Defense Expenses** up to the date the **Insureds** refused to settle such **Claim**; plus

(b)     seventy percent (70%) of any **Loss**, including **Defense Expenses**, in excess of the amount in clause (a) above, incurred in connection with such **Claim**. The remaining thirty percent (30%) of **Loss** and/or **Defense Expenses** in excess of the amount in clause (a) above will be carried by the **Insured** at its own risk and will be uninsured.

(3)     The Insurer will have no obligation to pay **Loss**, including **Defense Expenses**, or to defend or continue to defend any **Claim** after the Maximum Aggregate Limit of Liability for any applicable Coverage Part and/or the Maximum Aggregate Limit of Liability for the Policy as set forth in ITEM 3 of the Declarations is exhausted by the payment of **Loss**, including **Defense Expenses**. In the event the Maximum Aggregate Limit of Liability for the Policy is exhausted, the premium will be fully earned.

(C)     **NOTICE**

(1)     As a condition precedent to any right to payment under this Policy with respect to any **Claim**, the **Insured** shall give written notice to the Insurer of any **Claim** as soon as practicable after it is first made.

(2)     If, during the **Policy Period**, the **Insured** first becomes aware of a specific **Wrongful Act**, and if, during the **Policy Period**, the **Insured**:

(a)     provides the Insurer with written notice of the specific **Wrongful Act**, the consequences which have resulted or may result therefrom (including but not limited to actual or potential damages), the identities of the potential claimants, and the circumstances by which the **Insured** first became aware of such **Wrongful Act**; and



PRIVATE COMPANY REIMBURSEMENT INSURANCE POLICY
PC 71 00 03 00

(b)    requests coverage under this Policy for any subsequently resulting **Claim** for such **Wrongful Act**;

then any **Claim** subsequently made arising out of such **Wrongful Act** will be treated as if it had been first made during the **Policy Period.**

(3)    All notices under GENERAL CONDITIONS (C)(1) and (2) must be sent by certified mail or the equivalent to the address set forth in ITEM 7 of the Declarations, Attention: Claim Department.

**(D)    INTERRELATED CLAIMS**

All **Claims** arising from **Interrelated Wrongful Acts** shall be deemed to constitute a single **Claim** and shall be deemed to have been made at the earliest time at which the earliest **Claim** is made or deemed to have been made pursuant to GENERAL CONDITIONS (C)(1) or, if applicable, GENERAL CONDITIONS (C)(2).

**(E)    OTHER INSURANCE**

All **Loss** payable under this Policy will be specifically excess of, and will not contribute with, any other insurance, including but not limited to any insurance under which there is a duty to defend, unless such other insurance is specifically excess of this Policy. This Policy will not be subject to the terms of any other insurance policy.

**(F)    MERGERS AND ACQUISITIONS (CHANGES IN EXPOSURE OR CONTROL)**

(1)    If, during the **Policy Period**, the **Company** acquires any assets, acquires a **Subsidiary**, or acquires any entity by merger, consolidation or otherwise, or assumes any liability of another entity (an "Acquired Entity"), coverage shall be provided for any **Loss** resulting from **Claims** first made against the Acquired Entity, including its **Insureds** (other than any **Pension Benefit Plan** of such Acquired Entity) after the acquisition and during the **Policy Period** or, if applicable, the Optional Extension Period, for **Wrongful Acts** committed or allegedly committed at any time. There is no coverage for any **Pension Benefit Plan** of the Acquired Entity under this GENERAL CONDITIONS (F)(1) unless the Insurer specifically agrees to provide such coverage pursuant to SECTION II DEFINITIONS (H)(4) of the Pension and Welfare Benefit Plan Fiduciary Liability Coverage Part.

(2)    If, however, by reason of the transaction (or series of transactions) described in (F)(1) above, the Acquired Entity exceeds thirty five percent (35%) of the total assets or liabilities of the **Company**, as represented in the **Company's** most recent audited consolidated financial statements, coverage, as set forth in (F)(1) above, shall be provided only for a period of ninety (90) days after such transaction (or series of transactions); provided in all events coverage will not be available beyond the Policy Expiration Date. Coverage beyond the ninety (90) day period will be provided only if:

(a)    the Insurer receives written notice containing full details of the transaction(s); and

(b)    the Insurer specifically agrees by written endorsement to provide coverage with respect to such Acquired Entity, and the **Insured** has accepted any additional terms, conditions and limitations of coverage, and agrees to pay any additional premium that the Insurer in its sole discretion, shall deem appropriate.

(3)    If, during the **Policy Period**, any entity ceases to be a **Subsidiary**, the coverage provided under this Policy shall continue to apply to the **Insured Persons** who, because of their service with such **Subsidiary**, were covered under this Policy but only with respect to a **Claim** for a **Wrongful Act** that occurred or allegedly occurred prior to the time such **Subsidiary** ceased to be a **Subsidiary** of the **Company**.

PC 71 00 03 00



PRIVATE COMPANY REIMBURSEMENT INSURANCE POLICY
PC 71 00 03 00

(4)     If, during the **Policy Period**, there is a **Change in Control**, the coverage provided under this Policy shall continue to apply but only with respect to a **Claim** for a **Wrongful Act** committed or allegedly committed prior to the time of the **Change in Control**; and

(a)     no coverage will be available under this Policy for any **Claim** for a **Wrongful Act** committed subsequent to the **Change in Control**; and

(b)     the entire premium for the Policy will be deemed to be fully earned immediately upon the consummation of a **Change in Control**.

## (G)     CANCELLATION AND RENEWAL OF COVERAGE

(1)     Except for the nonpayment of premium, as set forth in (G)(2) below, the **Parent Company** has the exclusive right to cancel this Policy prior to the Policy Expiration Date set forth in Item 2 of the Declarations. Cancellation may be effected by mailing to the Insurer written notice when such cancellation shall be effective, provided the date of cancellation is not later than the date such notice is received by the Insurer. In such event, the Insurer shall retain the customary short rate portion of the earned premium. Return or tender of the unearned premium is not a condition of cancellation.

(2)     The Insurer may only cancel this Policy for nonpayment of premium. The Insurer will provide not less than ten (10) days written notice stating when the Policy will be canceled. Notice of cancellation will be sent to the **Parent Company** and the agent of record for the **Insured**, if applicable.

(3)     The Insurer is under no obligation to renew this Policy upon its expiration. Once the Insurer chooses to non-renew this Policy, the Insurer will deliver or mail to the **Parent Company** written notice stating such at least sixty (60) days before the Policy Expiration Date set forth in ITEM 2 of the Declarations.

## (H)     OPTIONAL EXTENSION PERIOD

(1)     If either the **Parent Company** or the Insurer does not renew this Policy, the **Parent Company** shall have the right, upon payment of the applicable additional premium set forth in ITEM 5 of the Declarations, to a one or two year extension of the coverage provided by this Policy with respect only to any **Claim** first made during the one or two year period of time after the Policy Expiration Date, but only with respect to **Wrongful Acts** occurring prior to the Policy Expiration Date.

(2)     As a condition precedent to the right to purchase the Optional Extension Period the total premium for this Policy must have been paid in full. The right of the **Parent Company** to purchase the Optional Extension Period will be immediately terminated if the Insurer does not receive written notice by the **Parent Company** advising it wishes to purchase the Optional Extension Period together with full payment of the premium for the Optional Extension Period within thirty (30) days after the Policy Expiration Date.

(3)     If the **Parent Company** elects to purchase the Optional Extension Period as set forth in (H)(1) and (2) above, the entire premium for the Optional Extension Period will be deemed to be fully earned at the Inception Date of the Optional Extension Period.

(4)     The purchase of the Optional Extension Period will not in any way increase the Limits of Liability set forth in ITEM 3 of the Declarations, and the Limits of Liability with respect to Claims made during the Optional Extension Period shall be part of and not in addition to the applicable Limits of Liability for Claims made during the **Policy Period**.

PC 71 00 03 00




PRIVATE COMPANY REIMBURSEMENT INSURANCE POLICY
PC 71 00 03 00

(I)    SPOUSES, ESTATES AND LEGAL REPRESENTATIVES OF INSURED PERSONS

The Coverage afforded under this Policy shall, subject to all of its terms, conditions and limitations, extend to:

    (1)    the lawful spouse of any **Insured Person**; provided however, that this GENERAL CONDITION (I) will apply only:

        (a)    to the extent that the spouse is a party to any **Claim** solely in their capacity as a spouse of such **Insured Person**; and

        (b)    for the purposes of any **Claim** seeking damages recoverable from marital community property, property jointly held by such **Insured Person** and spouse, or property transferred from such **Insured Person** to the spouse.

    (2)    the estate, heirs, legal representatives or assigns of any **Insured Person** or assigns of any **Insured Person** who is deceased, or against the legal representatives or assigns of any **Insured Person** who is incompetent, insolvent or bankrupt.

(J)    ASSISTANCE, COOPERATION AND SUBROGATION

    (1)    The **Insured** agrees to provide the **Insurer** with all information, assistance and cooperation that the **Insurer** may reasonably request, and further agrees that it will do nothing which in any way increases the **Insurer's** exposure under this Policy or in any way prejudices the **Insurer's** potential or actual rights of recovery.

    (2)    In the event of any payment under this Policy, the **Insurer** shall be subrogated to all of the potential or actual rights of recovery of the **Insured**. The **Insured** shall execute all papers required and will do everything necessary to secure such rights including but not limited to the execution of such documents as are necessary to enable the **Insurer** to effectively bring suit in their name, and will provide all other assistance and cooperation which the **Insurer** may reasonably require.

(K)    EXHAUSTION

If the Maximum Aggregate Limit of Liability for the Policy as set forth in ITEM 3(d) of the Declarations is exhausted by the payment of **Loss**, the premium as set forth in ITEM 8 of the Declarations will be fully earned, all obligations of the **Insurer** under this Policy will be completely fulfilled and exhausted, and the **Insurer** will have no further obligations of any kind whatsoever under this Policy.

(L)    REPRESENTATION CLAUSE

The **Insured** represents that the statements and particulars contained in the **Application** are true, accurate and complete, and agree that this Policy is issued in reliance on the truth of that representation, and that such particulars and statements, which are deemed to be incorporated into and constitute a part of this Policy, are the basis of this Policy. No knowledge or information possessed by any **Insured** will be imputed to any other **Insured**. In the event that any of the particulars or statements in the **Application** are untrue, this Policy will be void with respect to any **Insured** who knew of such untruth or to whom such knowledge is imputed.

(M)    ACTION AGAINST THE INSURER, ASSIGNMENT, AND CHANGES TO THE POLICY

    (1)    No action may be taken against the **Insurer** unless, as a condition precedent thereto:

        (a)    there has been full compliance with all of the terms and conditions of this Policy; and

        (b)    the amount of the obligation of the **Insured** has been finally determined either by judgment against the **Insured** after actual trial, or by written agreement of the **Insured**, the claimant and the **Insurer**.



PRIVATE COMPANY REIMBURSEMENT INSURANCE POLICY
PC 71 00 03 00

(2) Nothing contained herein shall give any person or entity any right to join the Insurer as a party to any Claim against the **Insured** to determine their liability, nor may the **Insured** implead the Insurer in any Claim.

(3) Assignment of interest under this Policy shall not bind the Insurer unless its consent is endorsed hereon.

(4) Notice to any agent or knowledge possessed by any agent or other person acting on behalf of the Insurer will not cause a waiver or change in any part of this Policy or prevent the Insurer from asserting any right under the terms, conditions and limitations of this Policy. The terms, conditions and limitations of this Policy may only be waived or changed by written endorsement signed by the Insurer.

**(N)  AUTHORIZATION AND NOTICES**

It is understood and agreed that the **Parent Company** will act on behalf of the **Insureds** with respect to:

(1) the payment of the premiums;

(2) the receiving of any return premiums that may become due under this Policy;

(3) the giving of all notices to the Insurer as provided herein, and

(4) the receiving of all notices from the Insurer.

**(O)  APPLICATION OF COVERAGE PARTS**

Except for the GENERAL TERMS AND CONDITIONS or unless specifically stated to the contrary, the provisions of each Coverage Part shall apply only to that particular Coverage Part and shall in no way be construed to apply to any other Coverage Part of this Policy. If any provision in these General Terms and Conditions is inconsistent or in conflict with the terms and conditions of any Coverage Part, the terms and conditions of such Coverage Part shall control for purposes of that Coverage Part.

**(P)  ENTIRE AGREEMENT**

The **Insured** agrees that the Declarations, Policy, including any endorsements, attachments and the **Application** shall constitute the entire agreement between the Insurer or any of its agents and the **Insured** relating to this insurance.



PRIVATE COMPANY REIMBURSEMENT INSURANCE POLICY
PC 71 02 03 00

# EMPLOYMENT PRACTICES LIABILITY COVERAGE PART

**THIS IS A CLAIMS MADE POLICY WITH DEFENSE EXPENSES INCLUDED IN THE LIMIT OF LIABILITY. PLEASE READ AND REVIEW THE POLICY CAREFULLY.**

In consideration of the payment of the premium, and in reliance on all statements made and information furnished to Executive Liability Underwriters, the Underwriting Manager for the Insurer identified in the Declarations (hereinafter the Insurer) including the Application, and subject to all of the terms, conditions and limitations of all of the provisions of this Policy, the Insurer, the Insured Persons and the Company agree as follows:

### I.    INSURING AGREEMENT

The Insurer shall pay on behalf of the Insureds **Loss** resulting from a **Claim** first made against the Insureds during the **Policy Period** or, if applicable, the Optional Extension Period, for a **Wrongful Act**.

### II.    DEFINITIONS

(A)    "**Claim**," as defined in GENERAL DEFINITIONS (C), shall include, for purposes of this Coverage Part, an administrative or regulatory investigation when conducted by the Equal Employment Opportunity Commission ("EEOC") or similar, state, local or foreign agency, which is commenced by the filing of a notice of charges, service of a complaint or similar document of which notice has been given to the Insured. A Claim will not include any labor or grievance arbitration or other proceeding which is subject to a collective bargaining agreement.

(B)    "**Insured**" means the **Insured Persons** and the **Company**.

(C)    "**Insured Person**" means:

   (1)    any past, present or future director, officer or employee of the **Company** including any part-time, seasonal, or temporary employee; and

   (2)    any leased employee or natural person independent contractor so long as he or she is working solely for the **Company** and only for conduct within his or her duties as such, but only if the **Company** provides indemnification to such individual in the same manner as is provided to the **Company's** employees.

(D)    "**Loss**," as defined in GENERAL DEFINITIONS (I), shall include, for purposes of this Coverage Part, damages (including back pay and front pay) and judgments (including pre-judgment and post judgment interest). **Loss** will not include any costs associated with the modification of any building or property in order to provide any reasonable accommodations required by, made as a result of, or to conform with the requirements of, the Americans With Disabilities Act  or the Civil Rights Act of 1964and any amendments thereto or any similar federal, state or local statute, regulation, or common law.

(E)    "**Third Party**" means any person(s), other than an **Insured Person**, with whom an **Insured** interacts within the scope of the **Company's** business.

A31

PRIVATE COMPANY REIMBURSEMENT INSURANCE POLICY
PC 71 02 03 00

(F)    "Third Party Wrongful Act" means any actual or alleged:

    (1)    discrimination (including unfair or disparate treatment) based upon such **Third Party's**, race, color, religion, age, gender, national origin, disability, sexual preference, pregnancy or other status that is protected pursuant to any applicable federal state or local statute or ordinance;  or

    (2)    unwelcome sexual advances, requests for sexual favors, or other verbal, visual or physical conduct of a sexual nature,

by an **Insured** against a **Third Party**.

(G)    "Wrongful Act" means any actual or alleged:

    (1)    wrongful termination of employment whether actual or constructive;

    (2)    employment discrimination of any kind including violation of any federal, state or local law involving employment or discrimination in employment which would deprive or potentially deprive any person of employment opportunities or otherwise adversely affect his or her status as an employee, because of such person's race, color, religion, age, gender, national origin, disability, sexual preference, pregnancy, or other protected status;

    (3)    unwelcome sexual advances, requests for sexual favors, or other verbal, visual or physical conduct of a sexual nature or other harassment in the workplace;

    (4)    wrongful deprivation of career opportunity, negligent supervision, failure to grant tenure, employment related misrepresentations, retaliatory treatment against an employee of the **Company**, failure to promote, demotion, wrongful discipline or evaluation, or negligent or refusal to hire;

    (5)    employment related libel, slander, humiliation, defamation, or invasion of privacy;

    (6)    failure to provide or enforce adequate or consistent policies and procedures relating to any **Wrongful Act**; and

    (7)    **Third Party Wrongful Act**;

by the **Company** or by any **Insured Person** in his or her capacity as such.

### III.    EXCLUSIONS

The Insurer shall not be liable to make any payment for **Loss**, and shall have no duty to defend or pay **Defense Expenses**, in connection with any **Claim** made against an **Insured**:

(A)    for any actual or alleged bodily injury, sickness, disease or death of any person, or damage or destruction of any tangible property including loss of use thereof; provided that however, this EXCLUSION (A) will not apply to any allegations of emotional distress, loss of reputation, mental anguish, or humiliation;

(B)    based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, event, or **Wrongful Act** underlying or alleged in any prior and/or pending litigation or administrative or regulatory proceeding which was brought prior to the Pending And Prior Proceeding Date set forth in ITEM 6(b) of the Declarations;

(C)    based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, event, or **Wrongful Act** which, before the Inception Date of this Policy, was the subject of any notice given under any other management liability insurance policy, directors and officers liability insurance policy, employment practices liability or similar insurance policy;



**PRIVATE COMPANY REIMBURSEMENT INSURANCE POLICY**
**PC 71 02 03 00**

(D)    brought about or contributed to in fact by:

       (1)    any intentionally dishonest, fraudulent or criminal act or omission; or

       (2)    any profit or remuneration gained by any Insured to which such is not legally entitled;

       as determined by a final adjudication in the underlying action or in a separate action or proceeding. Each **Insured** agrees that, if the Insurer has no liability to an **Insured** for **Loss** as a result of a **Claim** by reason of this EXCLUSION (D), such **Insured** will repay the Insurer upon demand all **Defense Expenses** paid on behalf of such **Insured** in connection with such **Claim**;

(E)    based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged violation of the Employee Retirement Income Security Act of 1974 (ERISA), including any amendments thereto, or any regulation promulgated thereunder or any similar federal, state, local or common law or regulation;

(F)    for any actual or alleged violation of the Occupational Safety and Health Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act of 1985, the National Labor Relations Act, including any amendments thereto, or any rule or regulation promulgated thereunder or any similar federal, state, local or common law or regulation;

       provided that EXCLUSIONS (E) and (F) above will not apply to actual or alleged retaliation against an **Insured Person** for exercising his or her rights under any such law(s);

(G)    seeking only injunctive or non-monetary relief, regardless of whether a prevailing claimant may be entitled to recover attorney's fees and costs; provided that this EXCLUSION (G) shall not apply to the Insurer's obligation to defend such **Claim** and to pay **Defense Expenses** resulting therefrom;

(H)    arising out of any actual or alleged liability of the Company under any express contract or agreement. With respect to this EXCLUSION (H), an "express contract or agreement" is defined as an actual agreement of the parties, the terms of which are openly set forth or declared at the time of making in clear or distinct language. This EXCLUSION (H) will not apply to the extent that an **Insured** would have been liable in the absence of such express contract or agreement; or

(I)    for any liability arising out of a lockout, strike, picket line, hiring of replacement workers, or other similar actions in connection with labor disputes or labor negotiations.

No conduct of any **Insured Person** will be imputed to any other **Insured Person** to determine the application of any of the above EXCLUSIONS.

PC 71 02 03 00

Page 3 of 3



## POLICYHOLDER DISCLOSURE

## NOTICE OF TERRORISM
## INSURANCE COVERAGE

Coverage for acts of terrorism is already included in your current policy. You should know that, effective November 26, 2002, under your existing coverage, any losses caused by certified acts of terrorism would be partially reimbursed by the United States under a formula established by federal law. Under this formula, the United States pays 90% of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage. The portion of your annual premium that is attributable to coverage for acts of terrorism is: $ waived. Any premium waiver is only valid for the current Policy Period.

I ACKNOWLEDGE THAT I HAVE BEEN NOTIFIED THAT UNDER THE TERRORISM RISK INSURANCE ACT OF 2002, ANY LOSSES CAUSED BY CERTIFIED ACTS OF TERRORISM UNDER MY POLICY COVERAGE WILL BE PARTIALLY REIMBURSED BY THE UNITED STATES AND I HAVE BEEN NOTIFIED OF THE AMOUNT OF MY PREMIUM ATTRIBUTABLE TO SUCH COVERAGE.

Name of Insurer:    **Greenwich Insurance Company**
Policy Number:      **ELU095285-06**

A34

## IN WITNESS ENDORSEMENT

GREENWICH INSURANCE COMPANY

ADMINISTRATIVE OFFICE:    SEAVIEW HOUSE
                          70 SEAVIEW AVENUE
                          STAMFORD, CT 06902-6040

STATUTORY HOME OFFICE:    1201 NORTH MARKET STREET
                          SUITE 501
                          WILMINGTON, DE 19801

It is hereby agreed and understood that the following In Witness Clause supercedes any and all other In Witness clauses in this policy.

All other provisions remain unchanged.

IN WITNESS WHEREOF, the Company has caused this policy to be executed and attested, and, if required by state law, this policy shall not be valid unless countersigned by a duly authorized representative of the Company.

Dennis Kane
President

Kenneth P. Meagher
Secretary

IL MP 9104 0704 GIC



## NOTICE TO POLICYHOLDERS

### U.S TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC")

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Policyholder Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Policyholder Notice carefully.**

OFAC administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous

- Foreign agents
- Front organizations
- Terrorists
- Terrorist organizations
- Narcotics traffickers

as "Specially Designated Nationals and Blocked Persons". This list can be found on the United States Treasury's web site - http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance will be immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, neither payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.

PN CW 05 0106        Includes copyrighted material of Insurance Services Office, Inc., with its permission



# PRIVACY POLICY

The XL America, Inc. insurance group ("We" or "Our Group"), respects the privacy of all personal information. Thus, the information We collect from our customers, or potential customers, is treated with the highest degree of privacy.

We have developed a Privacy Policy for Our Group that:

1) ensures the security of your information; and
2) complies with state and federal privacy laws.

The term "personal information" includes all information we obtain about a customer and maintain in our files. All persons with access to personal information are required to follow this policy.

## Our Privacy Promise

Your privacy rights are important to us. Analysis of your private information allows us to provide to you excellent service and products. Your trust in us depends upon the security and integrity of our records. Thus, We promise to:

1) Follow strict security standards. This will protect any information you share with us, or that we receive about you.
2) Verify and exchange data regarding your credit and financial status only for the purposes of: underwriting; policy administration; or risk management. We will obtain only reputable references and services.
3) Collect and use the least amount of information necessary to:
   a.    advise you and deliver excellent service and products; and
   b.    conduct our business.
4) Train our employees to securely handle private information. We will only permit authorized employees to have access to such information.
5) Not disclose data about you or your business to any organization outside Our Group or to third party providers unless:
   a.    we disclose to you our intent to do so; or
   b.    we are required to do so by law.
6) Not disclose medical information unless:
   a.    you give us written consent to do so; or
   b.    We disclose for any exception provided in the law.
7) attempt to keep our records complete and exact.
8) advise you how and where to access your account (unless prohibited by law).
9) advise you how to correct errors or make changes to your account.
10) inspect our procedures to ensure your privacy.

## Collection and Sources of Information

We collect only the personal information needed to:

1) determine suitability for a product or service;
2) manage the product or service; and
3) advise customers about our products and services.

The information we collect come from the following sources:

- **Submission** – In the application, you provide: your name; address; phone number; e-mail address; and other types of private information.

XLA-Privacy Notice (4/03)                    Page 1

A37

- **Quotes** – We collect information to determine:
  1) your eligibility for an insurance product; and
  2) your coverage cost.
  The data we collect will vary with the type of insurance you seek.
- **Transactions** – We maintain records of all transactions with Our Group and our third party providers. Our records include:
  1) your coverage choices;
  2) premiums; billing; and payment records.
  3) claims history; and
  4) other data related to your account.
- **Claims** –We maintain records on any claims that are made under your policies. The investigation of a claim involves collection of a broad range of information. It also involves many issues, some of which do not directly involve you. We will share with you facts that we collect about your claim; unless prohibited by law. The process of claim investigation also involves advice; opinions; and comments from many people. These may include attorneys and experts. This will help us determine how best to handle your claim. To protect the legal and privileged aspects of opinions and advice, we will not disclose this information to you.
- **Credit and Financial Reports** – We may receive your credit history. This is to support information you provided during the submission and quote processes. This history will help to underwrite your coverage.

## Retention and Correction of Personal Information

We retain personal information only as long as required by law; or as required by our business methods. If we become aware that any information may be incorrect, we will make reasonable effort to correct it.

## Storage of Personal Information

Safeguards are in place to protect data and paper files containing personal information.

## Sharing/Disclosing of Personal Information

We do not share personal information with a third party outside of Our Group for marketing purposes. This is true unless such sharing is permitted by law. Information may be shared with a third party for necessary servicing of the product. It may also be disclosed for other business reasons as permitted by law.

We do not share personal data outside of Our Group for servicing or joint marketing reasons. We will only disclose such data when a contract containing non-disclosure language has been signed by us and the third party.

Unless a consumer consents, we do not disclose "consumer credit report" type information outside of Our Group. "Consumer credit report type information" means such things as: net worth; credit worthiness; hobbies (piloting, boating, etc.); solvency, etc.

We also do not disclose outside of Our Group personal information for use in marketing. We may share information within Our Group regarding our experience and dealings with the customer.

We may disclose private information about a customer as allowed or otherwise required by law. The law allows us to share a customer's financial data within Our Group for marketing purposes. The law does not allow customers to limit or prevent such disclosures.

We may also disclose personal information about you or your business to:
- your independent agent or broker;
- an independent claim adjuster; investigator; attorney; or expert;



- persons or groups that conduct scientific studies. This includes actuaries and accountants;
- a medical care facility or professional to verify coverage for a covered person;
- an Insurance support group;
- another insurer if to prevent fraud;
- another insurer to properly underwrite a risk;
- insurance regulators;
- governmental authorities pursuant to law;
- an authority in response to a valid administrative or judicial order. This includes a warrant or subpoena;
- a party for the following purposes regarding a book of business: sale; transfer; merger; or consolidation. This applies whether the transaction is proposed or complete;
- a professional peer review group. This includes reviewing the service or conduct of medical care facilities or personnel;
- a covered person for providing the status of a transaction; or
- any of the following: a lienholder; mortgagee; assignee; lessor; or other person of record having a legal interest in the policy.

<u>Policy for Personal Information Relating to Nonpublic Personal Health Information</u>

We do not disclose nonpublic personal health information about a customer; unless consent is obtained from that customer.  However, such consent shall not be prohibited, limited or sought for certain insurance functions.  This includes, but is not limited to:

     a.    claims administration;
     b.    fraud prevention;
     c.    underwriting; policy placement or issuance; loss control or auditing.

<u>Access to Your Information</u>

The following persons will have access to personal information we collect:
employees of Our Group and third party service providers.  Information will only be collected as is needed in transactions with you.

<u>Violation of the Privacy Policy</u>

Any person violating this Policy will be subject to discipline. This may include termination.

For questions regarding this privacy statement, please contact your broker.



## Employment Practices Liability Loss Control

*XL Professional* is pleased to announce that Jackson Lewis has entered into an exciting risk management partner program with us. As one of the nation's largest and finest employment law firms providing representation to management in the defense of harassment, discrimination, wrongful discharge or other workplace related claims, Jackson Lewis will provide such valuable preventive services as a toll-free hotline, website information and regular risk management publications which provide our insureds with the most current and concise information available.

With 380 attorneys working in the firm's 23 offices throughout the United States, Jackson Lewis has the national scope and broad geographical expertise to work with our insureds on a timely and helpful basis.

Some of the things you can expect from Jackson Lewis include:

- An 800 # "hotline" to discuss employment matters with experienced employment law counsel

- Access to Jackson Lewis' web-based information, 24 hours a day, at www.jacksonlewis.com

- Access to "*Preventive Strategies*", Jackson Lewis' quarterly newsletter, and to electronic updates as developments occur

- Development or review of employee handbooks and other employment practices documentation at a discounted rate

- Presentation of in-house supervisory training programs addressing harassment, discrimination and other employment issues or access to on-line training at a discounted rate

- Risk management audits of wage-hour and overtime practices; harassment avoidance programs; union-avoidance programs; recordkeeping and other compliance efforts; and, other aspects of your Company's employment practices

- Complimentary attendance at the firm's breakfast series programs across the country and discounted attendance at multi-day conferences. To locate a program near you, go to www.jacksonlewis.com.

To use Jackson Lewis' risk management services, please contact Paul J. Siegel, Esq., a member of Jackson Lewis LLP, at 631-247-4605 or at siegelp@jacksonlewis.com.

A40

## (Q & A)
## COMMUNICATION TO INSURED COMPANIES AND BROKERS

### 1. What risk management program is offered by Indian Harbor Insurance Company?

To assist companies insured by Indian Harbor Insurance Company to reduce the risk of employment claims by employees, Indian Harbor Insurance Company has developed a valuable and cost-free risk management program. We have developed this program in conjunction with Jackson Lewis LLP, a national law firm with 23 offices and 380 attorneys across the United States. For almost 50 years, Jackson Lewis has assisted employers in developing preventive programs and to defend workplace law claims when they arise. Jackson Lewis represents employers in all aspects of workplace law, including employment litigation, disability and leave management, reductions in force, affirmative action, benefits, immigration, wage-hour, trade secrets and restrictive covenants, drug testing and labor relations. The firm maintains a website providing comprehensive information about these and other workplace law topics. To access that website, go to www.jacksonlewis.com. The website is only the first step of this program. In addition, Jackson Lewis is joining with Indian Harbor Insurance Company to provide a call-in "hotline" for companies insured by Indian Harbor Insurance Company to ask questions about workplace concerns. To contact the hotline, call 1-877-882-3574.

### 2. When I use the hotline, how should I identify myself?

To verify that callers are insured by Indian Harbor Insurance Company, a caller must provide his or her name and the name of the company insured by the policy number, as well as the caller's e-mail address, mailing address and telephone number. After obtaining this information, a representative of Jackson Lewis will ask you succinctly to state your question and to provide a brief description of the facts which relate to your question.

### 3. After I call the hotline, when can I expect to receive a response?

Callers often will receive a response the same day, but almost always within 24 hours of placing a call. While there may be slight delays due to a particular attorney's trial or travel schedule or other commitments, Jackson Lewis' long-standing policy is to return calls on the day they are received or within 24 hours of receipt of that call. That firm policy will apply to hotline calls.

### 4. If there is any problem or delay in receiving a hotline call, what should I do?

We have spoken with two senior Jackson Lewis partners, Paul J. Siegel and Michael Soltis, who will oversee management of the hotline. You can contact Mr. Siegel or Mr. Soltis if you have any questions about the hotline or any problems with regard to any concern about how a question you presented has been addressed. You can reach Mr. Siegel at 631-247-4605 or at siegelp@jacksonlewis.com. You can reach Mr. Soltis at 203-961-0404 or at soltism@jacksonlewis.com. Both Messrs. Siegel and Soltis have been employment attorneys for almost 30 years and have been partners at Jackson Lewis for more than 20 years. They are

experienced employment attorneys and have managed hotlines and other risk management programs for many years.

### 5. What questions are appropriately presented through the hotline (and which are not)?

The hotline is <u>not</u> intended to provide a determinative answer as to whether any specific adverse personnel action should be taken. Before a decision is made as to whether to discharge an employee, deny reinstatement after a leave of absence, take any action after receiving a complaint of harassment or taking any other adverse personnel action, your company should consult with experienced employment counsel. To provide advice as to what to do in a particular instance, retained counsel would require information as to what the company has done when similarly situated workers engaged in comparable acts of misconduct; a review of that individual's personnel file (and perhaps the file of the "victim"); interviews of potential witnesses; interviews of supervisors and others with knowledge of the facts underlying the contemplated adverse personnel action; review of applicable personnel policies and procedures; analysis of demographic information; an understanding of your Company's long term and short term operational and employment strategies; and, numerous other facts. The hotline is not designed for such an in-depth analysis.

In contrast, the hotline provides an excellent opportunity to obtain general information about a broad range of subjects. For example, while the hotline cannot be used to determine whether it would be discriminatory for a particular individual to be denied a promotion, you can ask about the factors to consider when evaluating possible claims relating to denial of promotion. Similarly, while the hotline cannot be used to determine whether a particular individual must be reinstated after a medical or family and medical leave, it can be used to provide information about when the law requires that a medical or Family Medical Leave Act ("FMLA") covered leave be granted and factors to consider when evaluating reinstatement. Simply stated, the hotline is for a general legal overview, not "can I fire this guy?" or similar adverse actions.

### 6. Can the hotline be used to inquire about sexual or other forms of harassment?

Yes. Hotline questions can address such issues as what the Equal Employment Opportunity Commission and courts generally consider to be harassment. Also, you can inquire about appropriate steps to take when investigating reports of harassment, including suggestions for witness interviews; documentation of a complaint and witness interviews; development of a sexual harassment policy; and, other preventive actions. (The hotline is not the appropriate vehicle for determining what to do after the investigation is conducted. Consideration of adverse personnel actions should be addressed with counsel.)

### 7. Can the hotline be used to discuss what the company believes are acts of insubordination and refusal to comply with a supervisor's instructions?

Yes. An overview of your company's rights can be obtained with respect to the types of actions <u>it could consider</u> when an individual fails or refuses to perform his or her job

2

A42

duties. However, as noted above, the hotline is not appropriate for use in determining whether an individual can be discharged because he or she did not perform a specific task. That analysis requires far more information and involvement by counsel than the hotline is intended to provide.

### 8.  How long can I speak to the attorney during a hotline call?

Most hotline calls last about 10 to 15 minutes. If a call requires more time, additional time will be allotted. While you can call as often as you wish, the hotline is not a substitute for a relationship with counsel. Only your counsel will have access to personnel policies, personnel files, past practice information and similar information needed to make recommendations about what should be done. The hotline is an excellent place to initiate a risk management decision or program. It is not intended to replace the relationship your company should develop with experienced employment counsel.

### 9.  Can wage hour issues be discussed during a hotline call?

The hotline provides a limited opportunity to inquire about when wages must be paid under state law; what sort of records should be maintained; and, the like. The hotline is not intended, however, to provide a determination as to whether your company is complying with wage hour laws or the manner in which any particular individual should be paid. Those issues are best left to the relationship your company has with its employment counsel.

### 10.  Can we ask questions about leaves of absence and when they should be given?

Yes. However, as noted above, whether a particular individual is entitled to leave or reinstatement after a leave is a matter that requires evaluation of an employer's past practices and its own personnel policies. Nonetheless, determination of whether the FMLA or state leave laws apply to your company and how they generally should be administered are appropriate subjects to discuss during a hotline call. Similarly, whether employees on leave can be required to use accumulated paid time off (e.g., sick days, vacation days, personal days, etc.) also can be addressed during a hotline call.

### 11.  Can we use the hotline call to discuss development of policies to preserve the at-will nature of employment?

Yes. Almost all states presume that employment is terminable on an at-will basis unless the employer has adopted personnel policies that limit the right to discharge on an at-will basis. However, whether your company has, intentionally or unintentionally, entered into an employment agreement or other limitation upon the right to discharge on an at-will basis, is beyond the scope of the hotline. Limitations on the at-will status of employment may arise from personnel policies, handbook provisions, offer letters or other corporate actions. The firm can provide sample receipt or acknowledgement forms for an employee handbook, which confirm that at-will status of employment. If you would like a sample document to discuss with your counsel, please send an e-mail to Paul Siegel or Mike Soltis, the Hotline Coordinators, at siegelp@jacksonlewis.com or soltism@jacksonlewis.com.

3

12. **Can I use the hotline to inquire about how benefits programs should be administered or how immigration processes operate?**

No. The hotline is for employment related issues, not benefits, fiduciary or immigration law questions. Those questions are beyond the scope of the hotline. However, we have negotiated discounted rates with Jackson Lewis for benefits and immigration-related representation. As a company insured by Indian Harbor Insurance Company, you will receive a 10% discount if you retain Jackson Lewis to address benefits or immigration issues.

13. **Can I use the hotline to inquire about whether our Company is a government contractor or subcontractor that must maintain an affirmative action plan (or how such a plan must be developed)?**

Yes. Jackson Lewis maintains an affirmative action/government contracts practice group, which will be available through the hotline, to address inquiries about the circumstances under which an employer is considered a federal contractor or subcontractor that must develop an affirmative action plan. However, what your company must do in a particular instance is beyond the scope of the hotline. For example, if your company is a government contractor or subcontractor with respect to a contract in excess of $50,000, it is likely to be required to develop an affirmative action plan, if it employs at least 50 employees. However, if your company lacks such a federal contract, but is part of a larger entity and a subsidiary or division of that parent company has a federal contract, government contractor or subcontractor status still may exist. Determination of that status (and the obligation to prepare an annual affirmative action plan) is subject to complex tests enunciated by the United States Department of Labor, Office of Federal Contract Compliance Programs. Such a determination, like the determination as to whether an individual should or should not be discharged, is beyond the scope of the hotline.

14. **Can I use the hotline to inquire about employment law issues relating to workers who are engaged by our company outside the United States?**

No. Jackson Lewis limits its practice to employment law solely within the United States. However, the firm may be able to provide an introduction to counsel practicing in the foreign country if the issue exists.

15. **Can the hotline be used to report a discrimination claim or a lawsuit?**

No. The hotline is for receiving a general overview about human resources and employment issues. It is not to be used to report the filing of administrative charges, arbitration demand letters, service of lawsuits or other notices of claim. Providing such information to Jackson Lewis does not obligate the firm to provide notice in your Company's behalf to Indian Harbor Insurance Company. It is your responsibility to notify your broker and Indian Harbor Insurance Company in accordance with the terms of the insurance policy. If you have any questions about how to report a claim, you should contact your broker or refer to the appropriate claim contact information contained in your Indian Harbor Insurance Company policy.

A44

**16.  Will the questions that I ask and the answers that I receive be disclosed to Indian Harbor Insurance Company?**

No.  Each month, the insurance company will receive from Jackson Lewis a narrative statement which will indicate, for each call, the name of the caller and his or her company, the policy number and the time spent on that call.  We will not be advised of the discussion during that telephone call (e.g., inquiry about harassment, at-will status, wage-hour issues, etc.).

**17.  Will my use of the hotline result in a higher premium if I use it more than another company uses the hotline?**

No.  The hotline is intended to provide risk management services and to assist your company to avoid claims and workplace disputes.  We encourage you to use the hotline. No company will be penalized for its use of the hotline when renewal discussions take place. (However, as we have explained above, the hotline is not a substitute for a relationship with experienced employment counsel.  While you can call to obtain general information and an overview of issues to consider, you should not use the hotline as a substitute for a relationship with counsel.)

A45



XL 80 39 04 05

**Endorsement No.: 1**
**Named Insured: American Capital Group**
**Policy No.: ELU095285-06**

**Effective: November 23, 2006**
**12:01 A.M. Standard Time**
**Insurer: Greenwich Insurance Company**

# CHANGE OF ADDRESS OF INSURER ENDORSEMENT

In consideration of the premium charged, as of the effective date of this Endorsement:

**Notices required to be given to the Insurer must be addressed to:**

**Notice to Claim Dept:**
XL Professional
One Hundred Constitution Plaza, 18th Floor
Hartford, CT 06103
Attn: Claim Dept.

**All other Notices:**
XL Professional
One Hundred Constitution Plaza, 17th Floor
Hartford, CT 06103
Attn: Underwriting

All other terms, conditions and limitations of this Policy shall remain unchanged.

XL 80 39 04 05

Page 1 of 1





XL 80 24 03 03

Endorsement No.: 2
Named Insured: American Capital Group
Policy No.: ELU095285-06

Effective: November 23, 2006
12:01 A.M. Standard Time
Insurer: Greenwich Insurance Company

# TERRORISM PREMIUM ENDORSEMENT

Please note: The portion of your annual premium set forth in Item 8. of the Declarations that is attributable to coverage for acts of terrorism is: $ waived.

All other terms, conditions and limitations of this Policy shall remain unchanged.

A.47



PC 72 10 07 01

Endorsement No.: 3
Named Insured: American Capital Group
Policy No.: ELU095285-06
Coverage Part: General Terms and Conditions

Effective: November 23, 2006
12:01 A.M. Standard Time
Insurer: Greenwich Insurance Company

# WASHINGTON AMENDATORY ENDORSEMENT

1. Section II. GENERAL DEFINITIONS (E) "Defense Expenses" of the General Terms and Conditions of the Policy is amended to insert the words "or the Insurer's" after the word "Company's".

2. Section III. GENERAL CONDITIONS (B) DEFENSE, ALLOCATION OF LOSS AND SETTLEMENT (3) of the General Terms and Conditions of the Policy is amended by deleting the last sentence in that provision.

3. Section III. GENERAL CONDITIONS (F) MERGERS AND ACQUISITIONS (CHANGES IN EXPOSURE OR CONTROL) (4) of the General Terms and Conditions of the Policy is deleted in its entirety and amended to read as follows:

   (4) If, during the Policy Period, there is a Change in Control, the coverage provided under this Policy shall continue to apply but only with respect to a Claim for a Wrongful Act committed or allegedly committed prior to the time of the Change in Control, and no coverage will be available under this Policy for any Claim for a Wrongful Act committed subsequent to the Change in Control.

4. Section III. GENERAL CONDITIONS (G) CANCELLATION AND RENEWAL OF COVERAGE (2) of the General Terms and Conditions of the Policy is deleted in its entirety and amended to read as follows:

   (2) The Insurer may only cancel this Policy for nonpayment of premium. The Insurer will provide not less than ten (10) days written notice stating when the policy will be canceled, and stating the reason for cancellation. Notice of cancellation will be sent to the Parent Company, the agent of record for the Insured, if applicable, and any other Insured shown in the Declarations.

5. Section III. GENERAL CONDITIONS (H) OPTIONAL EXTENSION PERIOD of the General Terms and Conditions of the Policy is deleted in its entirety and amended to read as follows:

   (H) OPTIONAL EXTENSION PERIOD

       (1) If either the Parent Company or the Insurer does not renew this Policy, or if the Parent Company cancels this Policy, or if the Insurer renews the Policy on terms less favorable to the Insureds, then without any payment of an additional premium, the Parent Company shall receive an extension of the coverage provided by this Policy with respect to any Claim first made during a period of ten (10) days commencing immediately after the Policy Expiration Date, but only with respect to Wrongful Acts occurring prior to the Policy Expiration Date. This 10-day period is called the "Automatic Extension Period" in this Policy.

       (2) If either the Parent Company or the Insurer does not renew this Policy, or if the Parent Company cancels this Policy, the Parent Company shall have the right, upon payment of the applicable additional premium set forth in ITEM 5 of the Declarations, to a one or two year extension of the coverage provided by this Policy with respect only to any Claim first made during the one or two year period of time immediately after the date upon which the Automatic Extension Period ends. However, this extension of coverage applies only to Wrongful Acts occurring prior to the Policy Expiration Date. This extension of



PC 72 10 07 01

**Endorsement No.: 3**
**Named Insured: American Capital Group**
**Policy No.: ELU095285-06**
**Coverage Part: General Terms and Conditions**

**Effective: November 23, 2006**
**12:01 A.M. Standard Time**
**Insurer: Greenwich Insurance Company**

coverage is called the "Optional Extension Period". Except in this Section III.(H), the Automatic Extension Period may also be referred to in this Policy as the Optional Extension Period.

(3)     As a condition precedent to the right to purchase the Optional Extension Period the total premium for this Policy must have been paid in full. The right of the Parent Company to purchase the Optional Extension Period will be immediately terminated if the Insurer does not receive written notice by the Parent Company advising it wishes to purchase the Optional Extension Period together with full payment of the premium for the Optional Extension Period within thirty (30) days from the effective date of nonrenewal, the date of renewal on terms less favorable to the Insureds, or the effective date of the Parent Company's cancellation.

(4)     If the Parent Company elects to purchase the Optional Extension Period as set forth in (H)(2) and (3) above; the entire premium for the Optional Extension Period will be deemed to be fully earned at the Inception Date for the Optional Extension Period.

(5)     The purchase of the Optional Extension Period will not in any way increase the Limits of Liability set forth in ITEM 3 of the Declarations, and the Limits of Liability with respect to the Claims made during the Optional Extension Period shall be part of and not in addition to the Limits of Liability for all Claims made during the Policy Period.

6.     Section III. GENERAL CONDITIONS (J) (2) ASSISTANCE, COOPERATION AND SUBROGATION of the General Terms and Conditions of the Policy is amended by deleting the words "in the event" and replacing them with the words "To the extent" and deleting the words "all of" in the first sentence.

7.     Section III. GENERAL CONDITIONS (K) EXHAUSTION of the General Terms and Conditions of the Policy is deleted in its entirety and amended to read as follows:

(K)     EXHAUSTION

If the Maximum Aggregate Limit of Liability for the Policy as set forth in Item 3(d) of the Declarations is exhausted by the payment of Loss, all obligations of the Insurer to pay Loss under this Policy will be completely fulfilled and exhausted.

8.     Section III. GENERAL CONDITIONS (L) REPRESENTATION CLAUSE of the General Terms and Conditions of the Policy is amended by including the following:

Provided, however, the Policy will not be void unless such particulars or statements were made with the intent to deceive.

9.     Section III. GENERAL CONDITIONS (N) AUTHORIZATION AND NOTICES (4) of the General Terms and Conditions of the Policy is deleted and amended to read as follows:

(4) the receiving of all notices from the Insurer except as otherwise provided in Section III. GENERAL CONDITIONS (G)(2).

All other terms, conditions and limitations of this Policy shall remain unchanged.

PC 72 10 07 01





PC 80 298 08 06

Endorsement No.: 4
Named Insured: American Capital Group
Policy No.: ELU095285-06
Coverage Part: General Terms and Conditions

Effective: November 23, 2006
12:01 A.M. Standard Time
Insurer: Greenwich Insurance Company

## AMEND DEFINITION OF CHANGE IN CONTROL

In consideration of the premium charged, Section II General Definition (B)(3) of the General Terms and Conditions of the Policy is deleted in its entirety.

## AMEND ALLOCATION PROVISION

In consideration of the premium charged, Section III. GENERAL CONDITIONS (B)(1) of the General Terms and Conditions of the Policy is amended to read in its entirety as follows:

"(1)    If both Loss covered by this Policy and loss not covered by this Policy are incurred, either because a Claim made against an Insured contains both covered and uncovered matters, or because a Claim is made against both an Insured and others not insured under this Policy, the insureds and the Insurer will allocate such amounts as follows:

    (a)    one hundred percent (100%) of Defense Expenses incurred will be allocated to covered Loss; and

    (b)    losses other than Defense Expenses will be allocated between covered Loss and uncovered loss on the basis of the relative legal exposures of the parties to covered and uncovered matters."

## AMEND GENERAL CONDITION (B)(2)

In consideration of the premium charged, Section III General Conditions (B)(2) of the General Terms And Conditions is amended to read in its entirety as follows:

"(2)    No Insured may incur any Defense Expenses or admit any liability for, make any settlement offer with respect to, or settle any Claim without the Insurer's consent, such consent not to be unreasonably withheld. The Insurer will have the right to make investigations and conduct negotiations and, with the consent of the Insured, enter into such settlement of any Claim as the Insurer deems appropriate."

## AMEND NOTICE OF CLAIM

In consideration of the premium charged, for purposes of Section III General Conditions (C) of the General Terms and Conditions, the Insured will be deemed to have given the Insurer notice of a Claim as soon as practicable after such Claim is first made if the Chief Executive Officer, President, General Counsel or HR Department (or Manager if an LLC) gives the Insurer written notice of such Claim as soon as practicable after first becoming aware thereof.

## WAIVER OF RETENTION

In consideration of the premium charged:

(1)    No Retention shall apply to a Claim which is in the form of a civil action for monetary relief and the Insurer shall thereupon reimburse the Defense Costs paid by the Insured, in the event of:

    (a)    a determination of No Liability of all Insureds; or

    (b)    a dismissal or a stipulation to dismiss the civil litigation Claim without prejudice and without the payment of any consideration by any Insured;

PC 80 298 08 06



 

provided, however, that in the case of (b) above, such reimbursement shall occur ninety (90) days after the date of dismissal or stipulation as long as the Claim is not brought again (or any other Claim containing Interrelated Wrongful Acts is not brought again) within that time, and further subject to an undertaking by the Company in a form acceptable to the Insurer that such reimbursement shall be paid back by the Company to the Insurer in the event the Claim (or any other Claim containing Interrelated Wrongful Acts) is brought after such ninety (90) day period and before the expiration of the statute of limitations for such Claim.

(2)    For the purposes of this Endorsement, "No Liability" means:

    (a)    a final judgement of no liability obtained prior to trial, in favor of all Insureds by reason of a motion to dismiss or a motion for summary judgement, after the exhaustion of all appeals; or

    (b)    a final judgement of no liability obtained after trial, in favor of all Insureds, after the exhaustion of all appeals. In no event shall the term "No Liability" apply to a Claim made against an Insured for which a settlement has occurred.

## DUTY TO DEFEND AT INSUREDS' OPTION

In consideration of the premium charged:

(1)    The Insureds will have the right to elect to defend any Claim against them if, at the time notice of such Claim is first given to the Insurer, the Insureds also notify the Insurer in writing that it is their intention to defend such Claim. If the Insureds so notify the Insurer, then, with respect to such Claim:

    (a)    Section I. DEFENSE OBLIGATIONS of the General Terms and Conditions will be deemed to have been deleted in its entirety and all references in the Policy to the Insurer having the right and duty to defend such Claim will also be deemed to have been deleted;

    (b)    the Insureds will have the right to settle such Claim without obtaining the Insurer's consent thereto if:

        (i)    the total amount of the settlement and all related Defense Expenses does not exceed, in the aggregate, fifty percent (50%) of the retention applicable to such Claim;

        (ii)    no Insured shall seek payment from the Insurer with respect to all or part of such settlement amount or any Defense Expenses;

        (iii)    the Insureds promptly give the Insurer written notice of such settlement; and

        (iv)    the Insureds comply in all respects with their obligations under Section II. GENERAL CONDITION (I) of the General Terms and Conditions of this Policy; and

    (c)    Section II. GENERAL CONDITION (B)(2) of the General Terms and Conditions of this Policy will be deemed to have been amended in accordance with paragraph (1)(b) above.

(2)    If, at the time notice of any Claim is first given to the Insurer, the Insureds do not also notify the Insurer in writing that it is their intention to defend such Claim, then the Insurer will have the right and duty to defend such Claim, even if such Claim is false, fraudulent or groundless, and Section I. DEFENSE OBLIGATIONS and Section II. GENERAL CONDITION (B)(2) of the General Terms and Conditions of this Policy will remain unchanged with respect thereto.

## DEBTOR IN POSSESSION ENDORSEMENT

In consideration of the premium charged, the term "Insured" shall include the Company as a debtor in possession, as such term is used in Chapter 11 of the United States Bankruptcy Code.

All other terms, conditions and limitations of this Policy shall remain unchanged.

PC 80 298 08 06



PC 80 300 08 06

Endorsement No.: 5
Named Insured: American Capital Group
Policy No.: ELU095285-06
Coverage Part: Employment Practices Liability

Effective: November 23, 2006
12:01 A.M. Standard Time
Insurer: Greenwich Insurance Company

## AMEND DEFINITION OF INSURED PERSON

In consideration of the premium charged, Section II. DEFINITIONS (C)(1) of the Coverage Part is amended to read in its entirety as follows:

"(1)   any past, present or future director, officer or employee of the Company, including any part-time, seasonal or temporary employee, and any volunteer or intern performing services for or on behalf of the Company; or"

## AMEND DEFINITION OF LOSS

In consideration of the premium charged, Loss, as defined in Section II. GENERAL DEFINITION (I) of the General Terms and Conditions and Section II. DEFINITIONS (D) of this Coverage Part, will include Defense Expenses incurred by an Insured in connection with the modification of any building or property in order to provide any reasonable accommodations required by, made as a result of, or to conform with the requirements of the Americans with Disabilities Act or any amendments thereto.

## AMEND DEFINITION OF WRONGFUL ACT HARASSMENT

In consideration of the premium charged, the term "Wrongful Act," as defined in Section II Definitions (G) of the Coverage Part, shall include any actual or alleged employment-related harassment against an employee of the Company by the Company or by any Insured Person in his or her capacity as such.

## AMEND EXCLUSION (F) FAIR LABOR STANDARDS ACT

In consideration of the premium charged, Section III. EXCLUSION (F) of the Employment Practices Liability Coverage Part is deleted in its entirety and replaced with the following:

"(F)   for any actual or alleged violation of the Occupational Safety ad Health Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act of 1985, the National Labor Relations Act or the Fair Labor Standards Act, including any amendments thereto, or any rule or regulation promulgated thereunder or any similar federal, state, local or common law or regulation;"

## AMEND CONTRACTUAL LIABILITY EXCLUSION

In consideration of the premium charged, it is understood and agreed that Section III. EXCLUSIONS (H) of this Coverage Part will not apply to Defense Expenses incurred by an Insured in the defense of a Claim to the extent such Claim is for an Insured's actual or alleged breach of an express contract or agreement of employment.

## ERISA EXCLUSION

In consideration of the premium charged, Section III Exclusions (E) of the Employment Practices Coverage Part is amended to read in its entirety as follows:

"(E)   for any actual or alleged violation of the Employee Retirement Income Security Act of 1974 (ERISA), including any amendments thereto, or any regulation promulgated thereunder or any similar federal, state, local or common law or regulation;"

All other terms, conditions and limitations of this Policy shall remain unchanged.

PC 80 300 08 06



 

PC 80 18 08 00

**Endorsement No.: 6**
**Named Insured: American Capital Group**
**Policy No.: ELU095285-06**

**Effective: November 23, 2006**
**12:01 A.M. Standard Time**
**Insurer: Greenwich Insurance Company**

# AMEND DEFINITION OF COMPANY

In consideration of the premium charged, the term "Company," as defined in Section II General Definitions (D) of the General Terms and Conditions of the Policy, is amended to include:

American Home Builders, Inc.
American Real Estate Securities
American Property Development, Inc.
American Capital Development, Inc.
American Capital Homes, Inc.
American Property Development N. CA.
American Property Development SW
Washington First Mortgage, Inc.
American Property Management
Monticello @ Southport Assoc. LLC.
The Dakota Apartments Assoc LLC
Northwind Apts.
Marketplace Apts.
Glenbrooke Apts.
Loma Vista Apts.
Cedarwest Apts.
Autumn Run Apts.
Woodmark Apts.
Addision Green Apts.
Highlands at Spectrum
Sterling Pointe

All other terms, conditions and limitations of this Policy shall remain unchanged.

PC 80 18 08 00

Page 1 of 1



PC 83 19 11 01

**Endorsement No.: 7**
**Named Insured: American Capital Group**
**Policy No.: ELU095285-06**
**Coverage Part: General Terms and Conditions, Employment Practices Liability**

**Effective: November 23, 2006**
**12:01 A.M. Standard Time**
**Insurer: Greenwich Insurance Company**

# GENERAL ERRORS & OMISSIONS EXCLUSION

In consideration of the premium charged, no coverage will be available under this Coverage Part for Claims based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty in connection with the rendering of, or actual or alleged failure to render, any services performed for others for a fee or commission or on any other compensated basis by any person or entity otherwise entitled to coverage under this Policy.

All other terms, conditions and limitations of this Policy shall remain unchanged.

PC 83 19 11 01

Page 1 of 1



●                                          ●                    PC 80 23 05 00
**Endorsement No.: 8**                      **Effective: November 23, 2006**
**Named Insured: American Capital Group**   **12:01 A.M. Standard Time**
**Policy No.: ELU095285-06**                **Insurer: Greenwich Insurance Company**

# PENDING AND PRIOR LITIGATION EXCLUSION (SPLIT LIMIT – EPL COVERAGE PART)

In consideration of the premium charged, Section III Exclusions (E) of the Management Liability And Company Reimbursement Coverage Part is amended to read in its entirety as follows:

*(E)    based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, event or Wrongful Act underlying or alleged in any prior and/or pending litigation or administrative or regulatory proceeding or arbitration which was brought prior to the Pending and Prior Litigation Date set forth in ITEM 6(a) of the Declarations;

In addition to, and not in limitation of the above paragraph, the Insurer shall not be liable to make any payment for Loss, including Defense Expenses, in connection with any Claim made against any Insured Person or the Company based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, event or Wrongful Act underlying or alleged in any prior and/or pending litigation or administrative or regulatory proceeding or arbitration as of November 23, 2006 to the extent that the amount of such Loss, when added to the amount of Loss, if any, previously paid under this Policy, would exceed $5,000,000;*

All other terms, conditions and limitations of this Policy shall remain unchanged.

PC 80 23 05 00                                                              Page 1 of 1





XL 80 50 08 06

**Endorsement No.: 9**
**Named Insured: American Capital Group**
**Policy No.: ELU095285-06**
**Coverage Part: General Terms and Conditions**

**Effective: November 23, 2006**
**12:01 A.M. Standard Time**
**Insurer: Greenwich Insurance Company**

# AMEND DEFINITION OF APPLICATION ENDORSEMENT

In consideration of the premium charged, the term "Application," as defined in General Definitions (A)(1) of the Policy, is amended to read in its entirety as follows:

"(1)      the Private Risk Protects application submitted to the Insurer by the Insured dated October 16, 2006; and"

All other terms, conditions and limitations of this Policy shall remain unchanged.





PC 80 287 07 06

**Endorsement No.: 10**
**Named Insured: American Capital Group**
**Policy No.: ELU095285-06**
**Coverage Part: General Terms and Conditions**

**Effective: November 23, 2006**
**12:01 A.M. Standard Time**
**Insurer: Greenwich Insurance Company**

# ADDITIONAL COMPANY ENDORSEMENT

In consideration of the premium charged:

(1)     The term "Company," as defined in Section II Definitions (D) of the General Terms and Conditions of the Policy, is amended to include the following entities (each an "Additional Company"), but only with respect to Wrongful Acts committed or allegedly committed on or after the date set forth opposite each Additional Company:

| | |
|---|---|
| American Home Builders, Inc | N/A |
| American Real Estate Securities | N/A |
| American Property Development, Inc. | N/A |
| American Capital Development, Inc. | N/A |
| American Capital Homes Inc. | N/A |
| American Property Development N. CA | N/A |
| American Property Development SW | N/A |
| American Property Management, Inc. | N/A |
| Washington First Mortgage, Inc. | N/A |

Each entity listed above shall also be deemed to be included in the term "Sponsor Organization" for purposes of the Pension and Welfare Benefit Plan Fiduciary Liability Coverage Part, if applicable.

(2)     No coverage will be available under this Policy for any Claim:

   (a)     made against any Additional Company based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any Wrongful Act actually or allegedly committed before the date set forth opposite such Additional Company; or

   (b)     based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any Wrongful Act committed or allegedly committed by any Additional Company before the date set forth opposite such Additional Company.

(3)     No coverage will be available under this Policy for Claims made against an Additional Company based upon, arising out of, directly or indirectly resulting from, in consequence of or in any way involving any fact, circumstance, situation, transaction, event or Wrongful Act underlying or alleged in any prior and/or pending litigation, administrative or regulatory proceeding or arbitration which was brought prior to the date set forth opposite each Additional Company:

| | |
|---|---|
| American Home Builders, Inc | September 21, 1987 |
| American Real Estate Securities | April 23, 2004 |
| American Property Development, Inc. | March 23, 1993 |
| American Capital Development, Inc. | January 16, 1987 |
| American Capital Homes Inc. | April 23, 2004 |
| American Property Development N. CA | April 23, 2004 |
| American Property Development SW | April 23, 2004 |
| American Property Management, Inc. | March 31, 1998 |
| Washington First Mortgage, Inc. | November 23, 2006 |

All other terms, conditions and limitations of this Policy shall remain unchanged.

A57



PC 80 177 03 06

**Endorsement No.: 11**
**Named Insured: American Capital Group**
**Policy No.: ELU095285-06**
**Coverage Part: General Terms and Conditions**

**Effective: November 23, 2006**
**12:01 A.M. Standard Time**
**Insurer: Greenwich Insurance Company**

# PRE-APPROVED COUNSEL ENDORSEMENT

In consideration of the premium charged, subject to the conditions below, the Insureds will be permitted to use the law firm(s) scheduled below to represent them with respect to Claims under this Policy. The foregoing permission, and the Insurer's obligation to pay Defense Expense to such counsel pursuant to this permission, is expressly conditioned on the following:

(i)    the Insurer shall be reasonably satisfied that such counsel is able and competent to handle any claim or suit for which such counsel is engaged to provide legal services;

(ii)    the Insurer's receipt from such counsel of a written consent, in form reasonably acceptable to the Insurer, that such counsel shall adhere in all respects to the Insurer's Billing and Reporting Guidelines for counsel;

(iii)    such counsel maintains an office located in the judicial jurisdiction where the litigation is filed; and

(iv)    the Insurer shall pay such counsel an hourly rate:

(a)    not to exceed the rate customarily charged by such firm to the Insured, and

(b)    which is no greater than the rate the Insurer customarily pays for counsel of commensurate experience and expertise in the same, or in a comparable, geographic location. Hourly fees of such counsel in excess of the hourly rate customarily paid by the Insurer shall be uninsured;

List of Approved Firms
Littler Medelson P.C.

All other terms, conditions and limitations of this Policy shall remain unchanged.

A58



100 Constitution Plaza
17th Floor
Hartford, CT 06103
USA
Phone  +1 860-246-1863
Fax      +1 860-548-9572
www.xlinsurance.com

September 18, 2007

Terry Edwards
Terry L. Edwards Agency
5719 N Division
Spokane, WA 99208

RE:    INSURED:             American Capital Group
       POLICY NO.:          ELU095285-06
       REFERENCE NO.:       ELU006297
       SUBJECT:             James Donovan

Dear Mr. Edwards:

We are in receipt of your correspondence dated September 14, 2007 together with its enclosures.

This matter has been assigned to Mr. Brian Smith, Claims Counsel, with the Reference Number noted above.  We ask that you direct all of your future related correspondence to Mr. Smith and refer to the above reference number.

After Mr. Smith has had an opportunity to review this matter, we will provide you with our initial analysis of the Policy as it applies to the materials we have received.  In the interim, until we complete our initial analysis, we think it appropriate to reserve all rights and defenses under the Policy or applicable law.

We look forward to working with you on this matter and please do not hesitate to contact us with any questions that you may have.

Very truly yours,

Sharon Logiudice
Administrative Assistant, Claims

Greenwich Insurance Company, Indian Harbor Insurance Company, XL Insurance America, Inc., XL Insurance Company of New York, Inc.,        Members of the XL Capital group
XL Select Insurance Company, XL Specialty Insurance Company

B59



100 Constitution Plaza
17th Floor
Hartford, CT 06103
USA
Phone +1 860-246-1863
Fax   +1 860-548-9572
www.xlinsurance.com

October 19, 2007

Terry Edwards
Terry L. Edwards Agency
5719 N. Division
Spokane, WA 99208

Re:   INSURED:        American Capital Group
      POLICY NO.:     ELU095385-06
      CLAIM NO:       ELU006297
      SUBJECT:        James Donovan y. American Capital Group, et al

Dear Mr. Edwards:

We are in receipt of the materials filed in connection with the above referenced matter. Please be advised that we will be monitoring this matter on behalf of Greenwich Insurance Company ("Greenwich") in connection with this matter. We ask that you refer to the above reference number with respect to any future communications in connection with this matter.

The Policy contains a $10,000,000 maximum aggregate limit of liability, inclusive of Defense Expenses, for all Claims first made against an Insured during the Policy Period of November 23, 2006 to November 23, 2007. The Policy also has a $35,000 per-claim retention under the Employment Practices Liability coverage part, which is the responsibility of the Insured.

We have reviewed the materials submitted in connection with the above referenced matter. This analysis is necessarily based solely upon the unsubstantiated allegations made in that letter and should in no way be construed as an independent assessment by Greenwich of their merits. In addition, these views are not intended by any means to be exhaustive or exclusive and we expressly reserve all of Greenwich's rights under the Policy or otherwise to raise additional policy terms and conditions when appropriate.

On or about September 17, 2007, the Plaintiff, James Donovan (the "Plaintiff") filed a Complaint in the Sacramento County Superior Court in California (the "Complaint") against American Capital Group, Inc, Property Development , Inc., American Capital Home, Inc. (the "Defendants") alleging that she entered into a contract with the Defendants for compensation which included annual salary and a bonus plan. The Plaintiff states that the Defendant refused to pay the Plaintiff a portion of the bonus in compliance with the terms of the contract. Furthermore, American Capital Group attempted to amend the Profit Sharing Plan which the Plaintiff was a participant. The Plaintiff refused to sign the amended plan as he felt some of the terms were illegal. The Plaintiff further states that he was terminated for refusing to sign the amended Profit Sharing Plan. The Complaint alleges breach of contract for both the bonus and profit sharing plans, unlawful collection of wages previously paid, waiting time penalties, breach of covenant of good faith and fair dealing, unfair competition and wrongful termination.

The above-referenced Policy provides coverage, subject to all Policy terms and conditions, in connection with Claims for Wrongful Acts. However, Exclusion III(F) as amended by endorsement No. 5 of the Employment Practices Liability Coverage Part of the Policy states that no coverage is available "for any actual or alleged violation of the ...National Labor Relations Act or the Fair Labor Standards Act, including any amendments thereto, or any rule or regulation promulgated there under or any similar federal, state, local or common law or regulation. We bring this Exclusion to your attention as the Plaintiff alleges that she suffered damages due to the violations of the California Labor Law. Thus, there does not appear to be coverage for any Loss or Defense expenses for this portion of the Complaint.

Greenwich Insurance Company, Indian Harbor Insurance Company, XL Insurance America, Inc., XL Insurance Company of New York, Inc., XL Select Insurance Company, XL Specialty Insurance Company

Members of the XL Capital group

C60

Exclusion III(H) of the Employment Practices Liability Coverage Part of the Policy excludes coverage for any actual or alleged liability of the Company under any express contract or agreement. However, Endorsement No. 5 states that Exclusion H of the Employment Practices Liability Coverage Part of the Policy shall not apply to defense expenses. It appears that the current pending action arises out of an express agreement entered into by the Parties for the bonus and profit sharing plan. According to Exclusion III(H) there is no indemnity for this portion of the Complaint.

Additionally, Greenwich reserves the right to deny coverage for amounts that do not constitute "Loss." In light of The Plaintiffs allegation that Defendants should not be permitted to keep the withheld compensation promised under the contracts, Greenwich also reserves the right to deny coverage for amounts that do not give rise to a financial detriment that is covered by insurance, including amounts to which the Defendants are not legally entitled, and amounts that are uninsurable under law.

Under Section II(I) of the General Terms and Conditions to the Policy, Loss does not include "(1) the multiplied portion of any damage award; (2) matters which are uninsurable under the law pursuant to which this Policy is construed; and (3) fines, penalties or taxes imposed by law". We bring this Section to your attention as the Plaintiff is asking for penalties associated with waiting time penalties. There does not appear to be coverage for this part of the Complaint.

Furthermore, Section III(B)(2) of the General Terms and conditions to the Policy states that "[t]he Insurer will have the right to make investigations..." If the Insurer has no liability to an Insured for Loss as a result of a Claim, the Insured will repay the Insurer upon demand all Defense Expenses paid on behalf of such Insured in connection with such Claims.

According to Endorsement No. 34 to the Policy, "[t]he Insureds will have the right to elect to defend any Claim against them if, at the time notice of such Claim is first given to to the Insurer, the Insureds also notify the Insurer in writing that it is their intention to defend such Claim." The insured has indicated that they wish to retain Littler Mendelson to defend the Company subject to XI's negotiated rates with this counsel. Please be advised that Greenwich will approve the use of this firm as long as they comply with XL's litigation guidelines, a copy of which has been forwarded to them.    Furthermore, please be advised that Greenwich does not cover travel costs for attorneys outside of the jurisdiction where the Compliant is filed.

Furthermore, pursuant to the terms of the Policy, the Insured may not "incur any Defense Expenses or admit any liability for, make any settlement offer with respect to, or settle any Claim without the Insurer's consent, such consent not to be unreasonably withheld." We therefore request that you immediately advise us of any settlement offers, proposals or inquiries made by either the Plaintiff or any of the Defendants in connection with this matter.

We continue to reserve all rights under the policy and applicable law in connection with this matter. Please do not hesitate to contact me if you should have any questions about this letter or if you should have any additional information of which we should be aware. We look forward to working with you on this matter.

Please be advised that pursuant to regulations promulgated under the California Insurance Code, if you believe that the matters referenced in your letters and attachments have been wrongfully denied or rejected, in whole or in part, you may have the matter reviewed by the California Department of Insurance. The California Department of Insurance can be contacted at California Department of Insurance Claim Services Bureau, 11th Floor, 300 South Spring Street, Los Angeles, CA 90013, telephone number (213) 897-5961.

Please do not hesitate to contact me at (860) 948-1843 if you have any questions or any additional information of which we should be aware. I look forward to working with you.

Very truly yours,

Brian D. Smith, Esq.
Senior Claims Counsel
XL Professional Insurance

C 61